**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

U.S. SECURITIES & EXCHANGE
COMMISSION,

   *Plaintiff-Appellee,*

 v.

IMRAN HUSAIN,

   *Defendant-Appellant,*

 and

GREGG EVAN JACLIN,

   *Defendant.*

No. 21-55859

D.C. No.
2:16-cv-03250-
ODW-E

OPINION

Appeal from the United States District Court
for the Central District of California
Otis D. Wright II, District Judge, Presiding

Argued and Submitted September 21, 2022
Pasadena, California

Filed June 13, 2023

Before:  Kim McLane Wardlaw and Sandra S. Ikuta, Circuit Judges, and Kathryn H. Vratil,[*] District Judge.

Opinion by Judge Vratil;
Dissent by Judge Wardlaw

## SUMMARY[**]

### Federal Securities Law

The panel reversed the district court's imposition of a civil penalty in the amount of $1,757,000 against Imran Husain in the Securities and Exchange Commission's civil enforcement action against Husain and his attorney for violations of federal securities laws.

The district court held that Husain had violated federal securities laws and imposed equitable statutory remedies, including a civil penalty of $1,757,000.

The parties disagreed what standard of review applied to the factual findings which underlay the district court's determination of the amount of the civil penalty in this case.  The panel held that the Fed. R. Civ. P. 56 principles that applied to requests for injunctive relief and whether to assess a second-tier penalty for violation of the securities laws applied equally to the district court's determination of

---

[*] The Honorable Kathryn H. Vratil, United States District Judge for the District of Kansas, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

the amount of a civil penalty. As with all relief under the Securities Act of 1933 and the Securities Exchange Act of 1934, this court reviews the district court's choice of remedy for abuse of discretion. But on a summary judgment motion, the district court can impose a civil penalty only if it determines that no genuine issues of material fact exist, and all factual uncertainty is resolved in favor of the non-moving party. The panel concluded that the district court necessarily abuses its discretion in granting summary judgment on the amount of a civil penalty if material issues of fact are in dispute.

Husain argued that the district court did not correctly determine the amount of his gross pecuniary gain under 15 U.S.C. §§ 77t(d)(2), 78u(d)(3)(B). The district court determined that Husain's gross pecuniary gain of $1,757,000 was undisputed. The panel held that Husain's declaration that legal fees of $287,500 were paid from the proceeds from the sale of five shell companies established a genuine issue of material fact whether such proceeds should be attributed to his—rather than his attorney's—gross pecuniary gain. Because Husain established a genuine issue of material fact whether he received or controlled the entire amount of the proceeds, the district court erred in finding on summary judgment that his gross pecuniary gain was $1,757,000.

The panel further held that Husain identified genuine issues of material fact on two additional factors that the district court considered in imposing the civil penalty: the degree of Husain's scienter and his recognition of the wrongful nature of his conduct. Ultimately, the district court may conclude that Husain's statements are not credible and that the Assistant U.S. Attorney's assessment in his criminal case was incorrect, but the district court erred in reaching

such a conclusion on this record. The panel therefore reversed the district court's grant of summary judgment on the amount of the civil penalty, and remanded.

Dissenting, Judge Wardlaw wrote that the disputed facts that the majority identifies are relevant only if the statutes authorizing civil penalties are read to require that courts trace the final disposition of ill-gotten gains to each individual defendant. This is a misreading of the statutory text and the court's precedent, which holds that defendants are liable for the funds they receive as well as the funds they distribute. Additionally, recent precedent forecloses the majority's understanding that a district court should not weigh a defendant's credibility on summary judgment under the civil penalty factors identified in *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980), especially on a record of admitted and undisputed violations of the securities laws. She would hold that the district court did not abuse its discretion in assessing an award of maximum civil penalties of $1,757,000 against Husain.

---

## COUNSEL

Daniel R. Walfish (argued) and Rachel Penski Fissell, Walfish & Fissel PLLC, New York, New York; George B. Newhouse Jr., Richards Carrington LLC, Los Angeles, California; for Defendant-Appellant.

Jeffrey A. Berger (argued) and Roberto A. Tercero, Senior Litigation Counsels; Michael A. Conley, Solicitor; Dan Berkovitz, General Counsel; Securities and Exchange Commission; Washington, D.C.; Amy J. Longo, Ropes & Gray LLP, San Francisco, California; for Plaintiff-Appellee

**OPINION**

VRATIL, District Judge:

Imran Husain and his attorney, Gregg Evan Jaclin, created publicly-traded shell corporations and sold them to privately-held companies.  The Securities and Exchange Commission (SEC) filed suit against Husain and Jaclin for violations of the Securities Act of 1933 (Securities Act), 15 U.S.C. § 77a *et seq*., the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. § 78a *et seq*., and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.  On cross motions for summary judgment, the district court held that Husain had violated the securities laws and imposed equitable statutory remedies, including a civil penalty of $1,757,000.  The district court found that as a matter of undisputed fact, Husain had received $1,757,000 in gross pecuniary gain from his violations and used that amount for the civil penalty.  On appeal, Husain challenges the amount of that penalty.  We have jurisdiction under 28 U.S.C. § 1291 and reverse.

## I.     Factual And Procedural Background

From 2008 to 2012, Husain and Jaclin created and controlled nine shell companies.  For each company, Husain acted as an undisclosed control person and recruited other individuals to serve as nominal CEOs.  Husain controlled each company and the activities of each CEO, and he had final authority over all matters involving the shells.  Husain also helped organize private placement offerings for the shares of the shells and paid people to recruit "straw shareholders."

Husain conducted initial public offerings for the stock of each shell, so that the shares could trade publicly.  At his

direction, each shell filed one or more registration statements on SEC Form S-1. Some 50 registration statements were misleading because they did not disclose Husain's role as the controlling person. On Jaclin's advice, Husain kept his name off the registration statements to avoid suspicion and attention from the SEC.

Between 2008 and 2012, in coordination with Jaclin and outside auditors, Husain directed the preparation of various SEC filings related to eight of the shells. These SEC filings contained material misrepresentations and omissions regarding the business purposes of the shells, Husain's role as the control person and promoter, the nature of the straw shareholders and puppet CEOs and, in two instances, the existence of merger plans.[1] In total, Husain oversaw the SEC filings of more than 35 materially false and misleading periodic reports.

Husain understood that the shells were valuable because they allowed their buyers—which often were privately-held corporations with ongoing businesses—to control the shares and corporate actions of the companies. After the sale of each shell, the puppet CEO resigned and the new owner installed new management. Husain sold seven of the shells through reverse mergers.[2]

---

[1] Husain directed, reviewed and approved SEC filings for the Health Directory, Inc. and Movie Trailer Galaxy, Inc. shells, falsely claiming that neither company had merger plans, even though purchasers had already placed sales proceeds into escrow.

[2] A reverse merger is a transaction in which a privately-held corporation acquires a publicly-traded corporation, thereby allowing a private corporation to transform into a publicly-traded corporation without an initial stock offering. *SEC v. M & A West, Inc.*, 538 F.3d 1043, 1046

Once the shell companies were sold, the sales proceeds flowed to an escrow account, pursuant to an escrow agreement signed by nominee-representatives that Husain appointed. The escrow agent then paid Jaclin's firm's legal fees. After paying the legal fees, the escrow agent wired the proceeds to the nominee-representative's bank account. Alternatively, some proceeds were paid to the offshore accounts of two entities, Liric and Ucino, that the SEC claimed were owned or controlled by Husain. The sales of five shell companies (Ciglarette, Inc., Rapid Holdings, Inc., Resume in Minutes, Inc., Movie Trailer Galaxy, Inc., and Health Directory, Inc.) within the five-year statute of limitations period generated gross proceeds of $1,787,000.[3]

Together, Husain and Jaclin tried to conceal their scheme. They communicated with each other through email accounts in the names of the puppet CEOs and hired a computer consultant to destroy emails between them. In 2012, Husain coached the puppet CEO of PR Complete Holdings, Inc. on how to testify before the SEC and instructed her to testify falsely by leaving his name out of it.

---

(9th Cir. 2008). As in the reverse mergers at issue here, the public shell company has minimal assets and liabilities and no actual operations. *Id.*

[3] According to Husain's answer in the civil action, "he and Jaclin sold five shel[l] companies to purchasers and realized gross proceeds in connection with such sales of $1.6 or thereabouts. From these proceeds various entities, including attorney Jaclin, were paid expenses in connection therewith. Defendant otherwise denies that he netted $2.25 million in proceeds for such sales as alleged in" this paragraph. Later in the answer, Husain "denie[d] that the proceeds totaled $2.25 M. [He] admit[ted] that net proceeds were approximately $1.6 million after expenses owing to attorney Jaclin, auditors, market makers, and other vendors were paid."

In May of 2014, a grand jury returned an indictment which charged Husain with obstruction of SEC proceedings in violation of 18 U.S.C. § 1505 and conspiracy to obstruct such proceedings in violation of 18 U.S.C. § 371. On October 14, 2014, Husain pleaded guilty to the conspiracy charge. As part of the factual basis for the guilty plea, Husain admitted that from 2008 to at least 2012, SEC filings for several shells which he controlled did not disclose his role. Husain also admitted that he recruited nominal CEOs who did not actually control the companies.

In May of 2017, based on Husain's ongoing cooperation in the criminal case, a grand jury indicted Jaclin for securities crimes.[4] Meanwhile, in 2016, the SEC filed this civil enforcement action against Husain and Jaclin.[5] From

---

[4] Specifically, the grand jury indicted Jaclin on charges of conspiracy to commit securities fraud and falsify information submitted to the SEC, securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff, submitting false filings to the SEC in violation of 15 U.S.C. §§ 77q(a), 77x, 78j(b) and 78ff, concealing material facts from the SEC in violation of 18 U.S.C. § 1001(a)(1), submitting false filings to the SEC in violation of 18 U.S.C. § 1001(a)(3) and obstructing SEC proceedings in violation of 18 U.S.C. § 1505.

[5] Claims 1 and 2 of the First Amended Complaint assert that Husain offered and sold the shell companies in unregistered offerings in violation of Section 5(a) and 5(c) of the Securities Act, and aided and abetted such violations. Claims 4, 5, 7 and 8 assert that Husain committed fraud in the offer or sale of the shell companies in violation of Sections 17(a)(2) of the Securities Act, Section 10(b) of the Exchange Act and SEC Rule 10b-5, and aided and abetted such violations. Claims 3 and 6 assert that Husain engaged in a scheme to defraud in the offer or sale of the shell companies in violation of Sections 17(a)(1) and 17(a)(3) of the Securities Act, Section 10(b) of the Exchange Act and SEC Rule 10b-5. Claim 9 asserts that Husain aided and abetted registration violations under Section 15(d) and Rules 12b-20, 15d-1 and 15d-13 of the Exchange Act. Claim 10 asserts control person violations

May of 2017 through August of 2019, while the criminal case was proceeding against Jaclin and Husain was awaiting sentencing, the district court stayed the civil enforcement action. Shortly after the district court lifted the stay, Jaclin consented to the entry of judgment. The district court imposed an injunction on Jaclin and ordered disgorgement in the amount of $32,700.00 and interest in the amount of $7,773.80, for a total of $40,473.80. The district court did not impose a civil penalty on Jaclin.

In Husain's criminal case, on November 12, 2019, the district court sentenced him to three years of probation. Jaclin pleaded guilty to obstructing SEC proceedings and conspiracy to obstruct such proceedings, and on June 22, 2020, the district court sentenced him to three years of probation with three months of partial home confinement.

In the civil enforcement action, on cross motions for summary judgment, the district court held that Husain had violated the Securities Act, the Exchange Act and SEC Rule 10b-5, as asserted in Claims 1, 3, 4, 6 and 7. In addition, it granted summary judgment on the issue of equitable remedies: it permanently enjoined Husain from violating securities laws, banned him from serving as an officer or director of a public company for seven years, barred him from participating in penny stock offerings for seven years and imposed a civil penalty of $1,757,000.[6]

---

under Section 20(a) of the Exchange Act and Rule 10b-5 of the Exchange Act. Except for Claims 7 and 10, the SEC asserts the same claims against Jaclin.

[6] The SEC's motion for summary judgment had also sought disgorgement, which the district court declined to order. Shortly after the SEC filed its summary judgment motion, the Supreme Court decided *Liu v. SEC*, 140 S. Ct. 1936 (2020), which—contrary to then existing

The district court found that based on the "totality of the circumstances" and the factors set forth in *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980), a permanent injunction was necessary to prevent Husain from violating the securities laws. It determined that Husain had (1) "acted with a high degree of scienter, over several years, in a repeated pattern of wrongdoing;" (2) had gone "to great lengths to conceal his shell factory scheme from regulatory oversight;" (3) "only stopped his scheme because he got caught, which gives rise to an inference of a reasonable expectation of future violations;" and (4) failed to recognize the wrongful nature of his conduct.

The district court noted that the *Murphy* factors also favored a civil penalty. Because Husain's conduct involved fraud and deceit, the district court imposed a second-tier penalty under the Securities Act and the Exchange Act.[7] It

---

Ninth Circuit case law—held that a disgorgement award under 15 U.S.C. § 78u(d)(5) could not exceed a wrongdoer's "net profits." *Id*. at 1940, 1946. The district court denied the SEC's request to take discovery on the issue of disgorgement because it determined that the other equitable remedies provided sufficient punishment and deterrence to Husain.

[7] The Securities Act and the Exchange Act establish three tiers of civil penalties: (1) a first tier for any statutory violation, (2) a second tier for a violation that "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," 15 U.S.C. §§ 77t(d)(2)(B), 78u(d)(3)(B)(ii), and (3) a third tier for a violation that both "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and "resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii). Each tier has a statutory cap, which is the greater of (1) a fixed monetary amount (periodically adjusted for inflation) and (2) the gross amount of pecuniary gain to defendant as a result of the violation. 15 U.S.C. § 77t(d)(2) (civil penalties for violations of Securities Act); 15 U.S.C. § 78u(d)(3)(B) (civil penalties for violations of Exchange Act). The statutory cap for

found that $1,757,000 was the undisputed amount of Husain's gross pecuniary gain and granted the SEC's request for a civil penalty in that amount.[8]

Husain filed a motion to reconsider the amount of the civil penalty, arguing that his "pecuniary gain" should take into account expenses which Jaclin paid from gross proceeds over which Husain had no control. Hussain argued that he "did not realize (or ever receive) the gross payments." The district court denied the motion to reconsider, finding that it merely reiterated arguments raised in Husain's summary judgment opposition and stating that in determining the appropriate civil penalty, it had "thoroughly reviewed the record and relevant legal authority." The district court did not directly address Husain's argument that the gross proceeds went to Jaclin and that Husain did not receive any proceeds until Jaclin had paid other individuals and expenses.

As noted, Husain argues that the district court erred in granting summary judgment on the amount of the civil penalty.

---

second-tier penalties, which the district court imposed here, is the greater of $75,000 or "the gross amount of pecuniary gain to such defendant as a result of the violation." 15 U.S.C. §§ 77t(d)(2)(B), 78u(d)(3)(B)(ii); 17 C.F.R. § 201.1001(a) & Table I.

[8] Husain and Jaclin sold five shell companies within the statute of limitations period for total proceeds of $1,787,000. From this amount, the district court subtracted $30,000 for attorney's fees that it had ordered Jaclin to disgorge. This calculation was in error because the district court had actually ordered Jaclin to disgorge $32,700. Because the district court erred on other grounds, we need not address this discrepancy.

## II.     Standard Of Review

We review de novo a district court decision to grant summary judgment. *Evanston Ins. Co. v. OEA, Inc.*, 566 F.3d 915, 918 (9th Cir. 2009). Viewing the evidence in the light most favorable to the non-moving party, we determine whether genuine issues of material fact exist and whether the district court correctly applied the substantive law. *Id.* at 918–19. As to the district court's formulation of remedies under the Securities Act and the Exchange Act, we review for abuse of discretion. *See SEC v. Murphy (Murphy II)*, 50 F.4th 832, 842 (9th Cir. 2022).

The parties disagree what standard of review applies to the factual findings which underlie the district court's determination of the amount of the civil penalty in this case. The SEC seeks review for abuse of discretion, and argues that the district court did not apply the incorrect legal standard and its underlying factual findings were not clearly erroneous. Husain argues that although the substance of the civil penalty is reviewed for abuse of discretion, the factual predicates must be reviewed de novo because the district court determined them on a summary judgment record.

We have not previously addressed this exact issue. In the context of injunctive relief on a summary judgment record, however, we have held that a district court cannot "resolve any genuine factual issue, including credibility" and must resolve "all factual inferences . . . against the moving party and in favor of the opposing party." *SEC v. Koracorp Indus., Inc.*, 575 F.2d 692, 698 (9th Cir. 1978). Stated otherwise, a court may issue injunctive relief on a summary judgment record, but not if the record reveals a genuine issue of fact that is material to the grant of the injunction. *Murphy*, 626 F.2d at 655 (permanent injunctions may be granted on

summary judgment, given proper record). Likewise, to determine whether the securities laws authorize a second-tier civil penalty—which depends on whether defendant acted with scienter—"a district court must determine whether genuine issues of material fact exist, and must resolve any uncertainty in favor of the non-moving party." *SEC v. M & A West, Inc.*, 538 F.3d 1043, 1054 (9th Cir. 2008).

The Rule 56 principles that apply to requests for injunctive relief and whether to assess a second-tier penalty for violation of the securities laws apply equally to the district court's determination of the amount of a civil penalty. As with all relief under the Securities Act and the Exchange Act, we review the district court's choice of remedy for abuse of discretion. *Murphy II*, 50 F.4th at 842. But on a summary judgment record, the district court can impose a civil penalty only after it has determined that no "genuine issues of material fact exist" and all factual uncertainty is resolved in favor of the non-moving party. *M & A West*, 538 F.3d at 1054; *see Murphy*, 626 F.2d at 655. In other words, if "material issues of fact are in dispute," the district court necessarily abuses its discretion in granting summary judgment o n the amount of a civil penalty. *Koracorp*, 575 F.2d at 695.

## III.  Analysis

On the SEC's motion for summary judgment, the district court imposed a second-tier penalty of $1,757,000, which it determined was the undisputed amount of Husain's gross pecuniary gain. On appeal, Husain argues that the district court (1) did not correctly determine the amount of his gross pecuniary gain, (2) did not view the factual record in the light most favorable to him as the non-moving party and

(3) abused its discretion in imposing the civil penalty of $1,757,000.[9]

A. <u>Calculation Of Gross Amount Of Husain's Pecuniary Gain</u>

The Securities Act and the Exchange Act set maximum penalties for each violation.   15 U.S.C.   §§ 77t(d)(2), 78u(d)(3)(B).   Here, for a second-tier penalty, the district court was authorized to impose a penalty which was the greater of $75,000 or "the gross amount of pecuniary gain to . . . defendant as a result of the violation."[10]

As noted, the district court determined that Husain's gross pecuniary gain of $1,757,000 was undisputed.[11] Husain argues that the district court erred because it conflated the total sales proceeds from the sale of the five

---

[9] The SEC argues that the district court did not need to consider Husain's argument about the amount of his gross pecuniary gain because he first raised it in his summary judgment reply brief, after discovery had closed and the SEC had completed briefing on its summary judgment motion. In fact, Husain raised the issue in his opposition to the SEC's summary judgment motion, in his statement of genuine disputes of material fact and in his declaration.  Husain adequately preserved his objection to the district court's calculation of his gross pecuniary gain.

[10]  15 U.S.C.  §§ 77t(d)(2)(B), 78u(d)(3)(B)(ii).   Because Husain's violations occurred between March 4, 2009 and March 3, 2013, the fixed statutory amount for a second-tier violation was $75,000.  Table I to 17 C.F.R. § 201.1001.

[11] The district court has discretion to determine the number of securities violations on which to impose civil penalties.  *Murphy II*, 50 F.4th at 848.  Here, the district court did not specify the number of Husain's violations or address the fixed statutory cap of $75,000 for each violation.  It relied on its determination of Husain's gross pecuniary gain from the aggregate violations involving the five shell corporations which were sold within the statute of limitations.

shell companies with the gross amount of his individual gross pecuniary gain.[12]

The district court did not explain its conclusion that the gross pecuniary gain of $1,757,000 to Husain was "undisputed."  It apparently relied solely on Husain's concession that the sales prices of five shell companies totaled $1,787,000.  The district court did not explain how Husain's concession about total "sales" established the exact same amount in "gross pecuniary gain" to him.

The SEC argues that the $1,757,000 in gross pecuniary gain was undisputed because Husain admitted that (1) he had final authority on all matters involving the shells; (2) he appointed shareholder representatives for each shell and representatives received sale proceeds from Jaclin's escrow account; and (3) the gross proceeds generated from the sale of the shell companies amounted to $1,787,000.[13]  Viewed in the light most favorable to Husain, however, these admissions establish only that he *and Jaclin* received total sales proceeds of $1,787,000.

The fact that Husain had final authority over the shells and appointed shareholder representatives does not establish that he controlled or constructively received the proceeds.

---

[12] Husain also argues that despite the qualifier "gross" in the phrase "gross amount of pecuniary gain," the word "gain" suggests a deduction for expenses.  We need not address this argument because even if business expenses are included in Husain's "gross pecuniary gain," he has demonstrated a genuine issue of material fact whether he received the entire $1,757,000 of sales proceeds.

[13] The SEC argues that Husain forfeited his argument that he did not control the selling shareholders or their representatives, but Husain raised the issue in his statement of genuine disputes of material fact and in his declaration.

The record indicates that the proceeds flowed to an escrow account, and the escrow agent then wired the proceeds to the nominee-representative's bank account, less any amounts owed for Jaclin's firm's legal fees. Husain submitted a declaration stating that costs of $1,618,300 were paid from the "yielded amount" from the sales of the shell companies. Husain's declaration stated that of the $1,618,300 in costs, $287,500 was for legal fees.[14] Viewing the evidence in a light most favorable to Husain, before he received or had control of any sales proceeds, Jaclin paid expenses to himself and third parties whom Husain did not own or control.

In the district court, the SEC attempted to substantiate the $1,757,000 amount by arguing that "[w]ire transfer records show that two entities controlled by Husain, Ucino and Liric, received proceeds from Jaclin's firm." The SEC did not argue that Ucino and Liric received all of the proceeds or cite evidence that Husain controlled either entity. The district court did not cite evidence that Husain controlled Ucino or Liric, and Husain's declaration stated that he did not. Again, the district court was required to resolve these factual ambiguities in favor of Husain. The

---

[14] The SEC relies on Husain's answer, which states, "Defendant admits he and Jaclin sold five shel[l] companies to purchasers and realized gross proceeds in connection with such sales of $1.6 or thereabouts." The SEC alleges that in making this statement, Husain conceded that he received $1.6 million. This is incorrect. In context, Husain's answer indicates that the sales of the shell companies generated gross proceeds of $1.6 million that went into an escrow account and from there (after deductions for Jaclin's firm's outstanding legal fees) to third parties. Elsewhere, Husain consistently stated that he did "not admit or agree that [his] net proceeds, the amount that would be subject to an order of disgorgement is $1.6 [million] or is anything close to it, as [he] has put forward his best estimate based on documents available to him that suggests his net proceeds from sales of the five companies [was] closer to $75,000."

government does not cite, and we are unaware of, a rule that the gain to entities controlled by a defendant is deemed to be gain to the defendant personally, absent evidence that the entities are the defendant's alter egos. The government has not shown that Ucino and Liric are alter egos of Husain.

On appeal, the SEC argues that the district court properly determined that Husain's gross pecuniary gain equaled the total proceeds to the enterprise (*i.e.* Husain and Jaclin) because "multiple defendants can each benefit from the same dollar of gain, in which case each can be penalized for that gain." *SEC v. Cole*, 661 F. App'x 52, 54 (2d Cir. 2016) (internal quotations and citations omitted). In cases of close cooperation between defendants or where multiple defendants mutually benefit from the same gains, some courts have concluded that the "best calculation of a single defendant's gain may be the total gains obtained by the group through that defendant's violations." *SEC v. Fowler*, 440 F. Supp. 3d 284, 299 (S.D.N.Y. 2020), *aff'd as modified*, 6 F.4th 255 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 590 (2021); *see SEC v. Amerindo Inv. Advisors Inc.*, No. 05 Civ. 5231 (RJS), 2014 WL 2112032, at *11 n.11 (S.D.N.Y. May 6, 2014) (civil penalties statutes focus on "gain to such defendant," but "multiple defendants can, and often do, each benefit from the same dollar of gain") (citations omitted), *aff'd*, 639 F. App'x 752 (2d Cir. 2016).

We need not decide if, or under what circumstances, a district court can use the total gain to all defendants as a measure of an individual defendant's gross pecuniary gain. Here, the district court did not equate Husain's gross pecuniary gain with the total gain to Husain and Jaclin. In fact, it deducted $30,000 from the total sales proceed to

account for the amount that Jaclin had to disgorge.[15]   In addition, the district court did not address—and the summary judgment record did not establish—that Husain and Jaclin each gained all of the sales proceeds received in Jaclin's account or suggest that the amounts of their individual gains were not reasonably ascertainable.   *Cf. Amerindo*, 2014 WL 2112032 at \*11 n.11 (applying aggregate gain to each defendant because "nearly impossible to determine how the defendants divided their spoils" and "any division of gain among them would be purely arbitrary").   In any event, Husain's declaration that legal fees of $287,500 were paid from the sales proceeds establishes a genuine issue of material fact whether such proceeds should

---

[15] The district court adopted the SEC's calculation that total proceeds for Husain were $1,787,000 *minus* the amount that Jaclin had to disgorge (approximately $30,000).   The amount that Jaclin had to disgorge, however, represented his "*profits*," not necessarily his gross pecuniary gain.

The dissent suggests that we have conflated the statutory requirements for the calculation of disgorgement, which must be a reasonable approximation of a defendant's profits from a violation of the securities law, *see Liu*, 140 S. Ct. at 1940–41, with the calculation of civil penalties, which has no such requirement.   In fact, the district court linked the two requirements when—based on the SEC's calculation of Husain's proposed *disgorgement, i.e.* the total sales proceeds minus the amount of attorney fees that Jaclin had to disgorge—it determined that Husain's "gross pecuniary gain of $1,757,000 is undisputed."   Even under the SEC's pre-*Liu* understanding that the amount of disgorgement is determined based on a defendant's gross proceeds (not his profit), the SEC assumed—without evidentiary support—that Jaclin agreed to disgorge the amount of his "gross proceeds."   As explained above, based on Husain's declaration that legal fees of $287,500 were paid from sales proceeds, he has raised a genuine issue of material fact whether Jaclin's gross proceeds were greater than $30,000.

be attributed to his—rather than Jaclin's—gross pecuniary gain.[16]

Because Husain established a genuine issue of material fact whether he received or controlled the entire amount of the sales proceeds for the five shell companies, the district court erred in finding on summary judgment that his "gross pecuniary gain" was $1,757,000.[17]

---

[16] The dissent suggests that our ruling implicitly imposes a "tracing requirement" for the disposition of ill-gotten gains. Contrary to the dissent's suggestion, however, the district court did not "calculate Husain's 'gross pecuniary gain' by using the total amount gained from the sale of the shells." Our ruling is limited to a review whether genuine issues of material fact precluded entry of summary judgment on the amount of a civil penalty based on the methodology that the district court used in calculating that penalty. As explained above, the district court adopted the SEC methodology and imposed a civil penalty of $1,757,000 based on its finding that this was the "undisputed" amount of Husain's gross pecuniary gain after it deducted Jaclin's disgorgement (which before *Liu*, the SEC equated with Jaclin's "gross proceeds"). Because the district court chose to calculate Husain's civil penalty in this manner (*i.e.* determining the gross proceeds flowing to Husain individually), we need not address the dissent's suggestion that the district court alternatively could have imposed a higher civil penalty on Husain equal to the collective gross pecuniary gain to Husain and Jaclin.

[17] Husain argues that on remand, the SEC should not be permitted to take further discovery to cure its failure to establish his gross pecuniary gain. Here, we only address whether the district court properly granted summary judgment on the civil penalty in the amount of $1,757,000, not whether the district court can award such a penalty at a later proceeding based on its resolution of disputed factual issues. In its discretion, the district court may determine whether additional discovery should be permitted.

B. <u>Relevant Facts And Circumstances For Civil Penalty Determination</u>

In addition to the amount of his gross pecuniary gain, Husain has identified genuine issues of material fact on two additional factors that the district court considered in imposing the civil penalty: the degree of Husain's scienter and his recognition of the wrongful nature of his conduct.

A district court must determine the amount of civil penalties "in light of the facts and circumstances" of the case. 15 U.S.C. §§ 77t(d)(2)(A), 78u(d)(3)(B)(i). In doing so, courts consider the factors set out in *Murphy*. *See Murphy II*, 50 F.4th at 847. The *Murphy* factors, which we originally applied in determining whether injunctive relief is appropriate, include (1) the degree of scienter; (2) the isolated or recurrent nature of the infraction; (3) defendant's recognition of the wrongful nature of his conduct; (4) the likelihood that future violations might occur because of defendant's professional occupation; and (5) the sincerity of defendant's assurances against future violations.[18] *Murphy*, 626 F.2d at 655.

In finding that an injunction was appropriate—and presumably in finding that a maximum civil penalty should be imposed—the district court determined that (1) Husain acted with a high degree of scienter, (2) he engaged in a repeated pattern of wrongdoing, (3) he failed to recognize the wrongful nature of his conduct and (4) he only stopped because he got caught, which gives rise to an inference of

---

[18] Husain argues that the district court erred in applying the *Murphy* factors to determine the amount of the civil penalty. We need not reach the issue whether the *Murphy* factors apply beyond injunctive relief, because Husain waived this issue by not raising it below.

future violations.  As to at least two of these factors, Husain established a genuine issue of material fact.

As to whether Husain recognized the wrongful nature of his conduct, the district court noted that Husain "has repeatedly failed to acknowledge that there were victims of his fraudulent scheme, and he refuses to take responsibility for the impact of his illegal conduct on the market's integrity."  The district court did not identify victims other than the SEC and general market integrity.  Indeed, in finding him liable, the district court relied nearly exclusively on the theory that "Husain's shell factory scheme clearly undermined the integrity of the 'securities industry' as a whole and the 'public interest.'"

The district court did not address Husain's declaration, which admitted that he had deceived the SEC.  The SEC itself recognized that Husain had admitted at least part of his wrongdoing:     (1) that he violated the registration requirements of Sections 5(a) and (c) of the Securities Act; (2) that the SEC filings of the shell companies contained material misrepresentations and omissions; (3) that he was liable as a control person under Section 20(a) of the Exchange Act; and (4) that he "did not act in good faith" as to the Exchange Act violations.  In addition, Husain acknowledged that he was "remorseful and there [was] virtually no chance of him repeating such conduct."  He noted that the Department of Justice had reached the same conclusion in his criminal case.  Accordingly, the summary judgment record did not establish as a matter of undisputed fact that Husain "refuse[d] to take responsibility for the impact of his illegal conduct on the market's integrity."  The district court erred in finding otherwise.

Husain did present evidence and argument that his scheme had no direct victims because the shares of the shell companies were not publicly traded while he was the control person. Husain also summarized the Assistant U.S. Attorney's position in his criminal case, *i.e.* that "the shell corporations were legal entities and . . . Mr. Husain did not defraud investors." The district court did not specifically fault Husain for these arguments. Nor did it cite undisputed evidence that Husain's scheme victimized individual investors.

Viewing the evidence in the light most favorable to the non-movant, Husain's scheme did not victimize any member of the investing public and he took responsibility for deceiving the SEC. Accordingly, Husain established a genuine issue of material fact whether he recognized the wrongful nature of his conduct.

As to scienter, Husain does not dispute that he acted with some level of scienter, but he disputes the district court's conclusion that he acted with a "high degree" of scienter. In the context of securities laws, "scienter" is generally defined as the "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193–94 n.12 (1976). Whether a defendant acted with scienter is a "subjective inquiry," which ultimately "turns on the defendant's actual state of mind." *Gebhart v. SEC*, 595 F.3d 1034, 1042 (9th Cir. 2010).

In evaluating Husain's scienter, the district court found that "Husain acted with a high degree of scienter, over several years, in a repeated pattern of wrongdoing." The district court noted that Husain "went to great lengths to conceal his shell factory scheme from regulatory oversight" and he "only stopped his scheme because he got caught,

which gives rise to an inference of a reasonable expectation of future violations." Husain submitted a sworn declaration, however, which stated that "Mr. Jaclin [who was my attorney] knew of the omission of this disclosure; indeed, he advised me not to disclose it, saying it was not material and that the SEC did not 'need' this information, although I now realize that his advice was both wrong and illegal." As noted above, Husain presented evidence that he only intended to deceive the SEC, not investors. Viewing the evidence in a light most favorable to him, Husain raised a genuine issue of material fact on the degree of scienter. *See Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*, 739 F.2d 1434, 1436 (9th Cir. 1984) ("Summary judgment is generally inappropriate when mental state is an issue, unless no reasonable inference supports the adverse party's claim.").

In sum, Husain raised genuine issues of material fact on at least two factors—scienter and contrition—that the district court cited in imposing the civil penalty on a summary judgment record.[19] Ultimately, the district court

---

[19] The dissent concludes that our ruling "could effectively preclude any court from awarding injunctive relief or maximum civil penalties without an evidentiary hearing, even for confessed violations of the securities laws, because assessing the *Murphy* factors requires that the district court weigh evidence of a defendant's scienter and contrition." Our ruling does not reach so broadly. Indeed, in this case, Husain does not dispute that the district court properly entered summary judgment on liability and properly entered a permanent injunction. On the amount of a civil penalty, however, because the district court did not view the record evidence in the light most favorable to the non-moving party, it necessarily abused its discretion in imposing a civil penalty of $1,757,000. Even so, provided that a district court properly views the evidence under Rule 56 of the Federal Rules of Civil Procedure, we do not suggest that it would abuse its discretion by imposing the maximum civil penalty on summary judgment.

may conclude that Husain's statements are not credible and that the Assistant U.S. Attorney's assessment in his criminal case was incorrect, but such a conclusion was inappropriate on this record. *See M & A West*, 538 F.3d at 1055 ("summary judgment is singularly inappropriate where credibility is at issue") (quoting *Koracorp*, 575 F.2d at 699). We therefore reverse the district court's grant of summary judgment on the amount of a civil penalty.[20]

**REVERSED and REMANDED.**

---

[20] Husain also argues that the district court abused its discretion in imposing the maximum civil penalty because it did not consider factors other than those specified in *Murphy* such as (1) the absence of losses to investors and (2) the disparity between his penalty of $1,757,000 and the amount of Jaclin's disgorgement ($40,473 including interest) and the lack of the imposition of a civil penalty on Jaclin. Because we find that Husain established genuine issues of material fact on at least two of the factors that the district court did consider in determining the civil penalty, we need not address Husain's argument that the district court erred in failing to consider additional factors. We note, however, that during the remedy phase of the proceedings, the district court must consider factors beyond those set forth in *Murphy* if such factors are necessary to "assess the totality of the circumstances" of Husain's violations. *Murphy II*, 50 F.4th at 849 (quoting *Murphy*, 626 F.2d at 655); *see* 15 U.S.C. § 77t(d)(2)(A) (civil penalty amount "shall be determined by the court in light of the facts and circumstances"); 15 U.S.C. § 78u(d)(3)(B)(i) (same).

WARDLAW, Circuit Judge, dissenting:

Imran Husain orchestrated a scheme to create publicly-held shell companies in violation of the securities laws and to sell them in reverse merger transactions that he concedes violated Section 5(a) and Section 5(c) of the Securities Act. The district court granted summary judgment to the SEC based on Husain's primary liability for those violations and numerous other violations of the anti-fraud provision of the Securities Act (Section 17(a)(2)) and the Exchange Act (Section 10(b) and Rule 10(b)(5)), finding many material misrepresentations, especially Husain's failure to disclose in dozens of SEC filings that he was the control person and promoter of the shell companies. Nearly all of the facts material to Husain's liability under these statutes were admitted by Husain in his answer and during the summary judgment proceeding, and Husain does not appeal the district court's liability determination.

As equitable remedies, the SEC sought a permanent injunction, a second-tier civil penalty, a permanent bar against Husain from serving as an officer or director of a public company, and disgorgement of the net profits from the sale of the five shell companies sold within the statute of limitations period. The district court granted the SEC the permanent injunction, bars against certain securities-related activities, and a second-tier civil penalty in the amount of $1,757,000, following Husain's admission that the "total (gross) proceeds for the five companies amount to approximately $1,787,000." The district court denied the SEC's request for disgorgement, finding that the injunction, the bars, and the civil penalty were "sufficient punishment and deterrence" to address Husain's violations under the securities laws.

Even though the gross proceeds from the sales of the five shell companies were indisputably $1,787,000, Husain argues that the district court abused its discretion in assessing a penalty in that amount less the amount that his co-conspirator Jaclin paid in disgorgement. Husain asserts that there are disputed issues of material fact because the most the district court could lawfully award against him was "the gross amount of pecuniary gain" to him from the scheme, and there was no evidence that *he personally* received the gross proceeds from the sale of the shell companies.

While declining to decide how a defendant's "gross pecuniary gain" should be calculated under the civil penalty statutes, the majority remands the case on the ground that Husain's "gross pecuniary gain" is "disputed." However, the disputed facts that the majority identifies are relevant only if we read the statutes to require that courts trace the final disposition of ill-gotten gains to each individual defendant. That is a misreading of the statutory text and our precedent, which holds that defendants are liable for the funds they receive as well as the funds they distribute. Contrary to the holding of the majority, this is a question of law, not fact, and a question which the majority answers incorrectly.

Husain next argues that the district court should not have applied the *Murphy* factors to calculate the total amount of civil penalties, but even if they were the correct factors to apply, the district court misapplied them. *See SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980). The majority assumes that the *Murphy* factors apply, but instead of reviewing the district court's weighing of the uncontroverted record facts for an abuse of discretion, it conjures up disputed facts as to "the degree of Husain's scienter and his

recognition of the wrongful nature of his conduct." The majority effectively, and incorrectly, reviews each *Murphy* factor separately and de novo, holding that courts should not make "credibility" determinations at the summary judgment stage as to a defendant's scienter or contrition, even though the majority's approach is foreclosed by *Murphy* itself, as well as our recent decision in *SEC v. Murphy*, 50 F.4th 832 (9th Cir. 2022) (*Murphy II*).

Because the majority's approach is inconsistent with the text, purpose, and history of the civil penalty statute, as well as our binding precedent, and because the district court did not abuse its discretion in weighing the *Murphy* factors on this record of admitted and undisputed violations of the securities laws, I respectfully dissent.

## I.

The following facts are undisputed, and most, if not all, have been admitted by Husain in his guilty plea to criminal obstruction of justice and his filings in these proceedings. Husain created multiple shell companies from approximately 2008 to 2012, recruited friends and family to serve as nominal CEOs, and then directed them to retain co-conspirator Jaclin's law firm to handle the public offerings. Husain admitted that these were sham offerings. He knowingly filed over 50 registration statements and amendments with the SEC (on a Form S-1)[1] that contained material misrepresentations, and directed the shell

---

[1] A Form S-1 requires issuers to disclose the purpose of a proposed public offering of asset-backed securities, and requires the filer to disclose the company's officer, director, promoter, and control person. *See Boyce v. Soundview Tech. Grp. Inc.*, 464 F.3d 376, 380 n.4 (2d Cir. 2006). Husain did not disclose that he was the shell companies' control person on the relevant Forms S-1.

companies to file over 35 false and misleading statements that failed to disclose Husain's control of the companies.

Husain then sold seven of the shell companies in transactions not registered with the SEC, which he admits was a violation of Section 5 of the Securities Act. For the five shell companies sold within the statute of limitations period, Husain admits that "[t]he total (gross) proceeds for the five companies amount to approximately $1,787,000[,]" without accounting for costs of the sales. The purpose of the scheme was to sell the shells to facilitate "reverse merger" transactions, which allow privately traded companies to become publicly traded without going through the ordinary SEC registration process. While reverse mergers with shell companies are not per se illegal, they are associated with "the potential for investor harm" because there is a track record of "shell companies being used in fraudulent and manipulative schemes, such as pump-and-dump schemes." Publication or Submission of Quotations without Specified Information, 85 Fed. Reg. 68124, 68153 (Oct. 27, 2020); Securities Enforcement Remedies and Penny Stock Reform Act of 1990, Pub. L. No. 101-429, § 502(8), 104 Stat. 931, 951 (1990) (finding that "'reverse mergers' with shell corporations . . . are used to facilitate manipulation schemes and harm investors"). Here, the district court found Husain liable for at least two claims of fraud, determining that he "engaged in a scheme to defraud as the co-mastermind of the shell factory scheme" and "intentionally engaged in fraudulent, deceitful, and criminal actions to enable the public trading of the Shell Companies' stock."

Indeed, when the SEC began investigating the shell companies, Husain concedes that he attempted to cover up his conduct, creating false email accounts to communicate with Jaclin and "scrubbing" his emails from Jaclin's firm's

computers. After the SEC subpoenaed the CEO of one of the shell companies, Husain coached her testimony in order to conceal his involvement in the scheme. As a result of the overwhelming evidence against him, Husain cooperated with a criminal investigation into his fraudulent conduct and pleaded guilty to criminal obstruction of justice. In his guilty plea, Husain admitted that:

> (a) Husain hired Jaclin to advise him regarding the formation of the shell companies and to help prepare the corporate documents, including SEC filings;

> (b) from 2008 to at least 2011, Husain "controlled various publicly traded 'shell corporations,'" and he "directed CEOs to form many of these shell corporations and controlled the actions taken by the CEOs;"

> (c) Jaclin and Husain "agreed that [Husain] should be considered as a 'consultant' only, even though [he] exercised control over the companies;"

> (d) Husain kept his name off corporate documents because Jaclin told Husain that the SEC would be unlikely to approve the registration statements if he were disclosed to be an officer or controlling shareholder;

> (e) under Jaclin's guidance, Husain recruited people whose "names appeared on the corporate documents and bank accounts as the company CEOs and officers but who did not exercise any actual control over the companies;"

(f) Jaclin was "fully aware" that Husain had "final authority on all matters involving the companies;"

(g) Husain knew that "the shell companies [he] was creating were valuable because they allowed the people who acquired them to completely control the shares and corporate actions that otherwise appeared to be legitimate public companies;"

(h) Husain agreed with Jaclin and the nominee CEO of PR Complete to obstruct the proceedings of the SEC by concealing facts surrounding [his] true involvement in PR Complete; and

(i) specifically, with advice from Jaclin, Husain "coached" the nominee CEO of PR Complete "how to testify" in testimony before the SEC, and "instructed her to testify falsely by leaving my name out of it" and to "withhold facts about my involvement" with the company.

After Husain's criminal conviction, the SEC filed an enforcement action against Husain and Jaclin, and Jaclin settled with the SEC, consenting to an injunction and paying disgorgement in the amount of roughly $40,000, including prejudgment interest.  Husain did not settle, even as he conceded that, as a result of his guilty plea, most of the factual disputes "ha[d] been greatly reduced, if not largely eliminated."

II.

On summary judgment, in calculating the civil penalty award, the district court first made the legal determination that Husain's "gross amount of pecuniary gain" could be calculated as the total gross proceeds from the sale of the shell companies, $1,787,000 less the amount that Jaclin paid in disgorgement pre-interest.  The majority reverses, asserting that there is a genuine dispute of material fact whether $1,757,000 represents "the gross amount of pecuniary gain to [Husain] as a result of the violation." Maj. Op. 14 (quoting 15 U.S.C. §§ 77t(d)(2)(B), 78u(d)(3)(B)(ii)).

While the majority fails to define the statutory phrase "gross amount of pecuniary gain," the disputed facts it identifies are relevant only if we assume the statute requires deducting expenses and tracing the ultimate disposition of gains to each individual defendant.  Although the majority characterizes this issue as a question of disputed fact, this is a question of statutory interpretation to be determined by reviewing de novo the text, purpose, and history of the civil penalty statutes.  *See Murphy II*, 50 F.4th at 842.  And the plain text of the statutes, and our precedent, allows the "gross amount of pecuniary gain" to be calculated based on the gross proceeds from the shell companies that Husain controlled, absent business deductions, which was undisputedly $1,787,000.

A.

The Securities and Exchange Acts authorize courts to impose three tiers of civil penalties.  *See* 15 U.S.C. §§ 77t(d)(2); 78u(d)(3)(B).  The statutory "tier determines the maximum penalty, with the actual amount of the penalty left up to the discretion of the district court." *SEC v. Kern*,

425 F.3d 143, 153 (2d Cir. 2005).  The district court must exercise discretion to determine the amount of the civil penalty "in light of the facts and circumstances" of a particular case.      *See*   15 U.S.C.   §§ 77t(d)(2)(A); 78u(d)(3)(B)(i).

The district court may impose first-tier penalties for any statutory violation.      However, if a violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," the district court may impose second-tier penalties.      *See id.* §§ 77t(d)(2)(B), 78u(d)(3)(B)(ii).[2]   At the time of Husain's violations, the statute imposed a statutory cap for second-tier penalties of either "$75,000" for "each such violation" or "the gross amount of pecuniary gain to such defendant as a result of the violation."  *Id.* §§ 77t(d)(2)(B), 78u(d)(3)(B)(ii); 17 C.F.R. § 201.1001, Tbl. I.[3]

Consistent with the plain text of the statute, the district court properly calculated Husain's "gross amount of pecuniary gain" based on the aggregate proceeds of his securities fraud, without deducting expenses. A "gross" gain means the "entire" gain "[u]ndiminished by deduction," compared to a "net" gain, which means "[t]he final amount remaining after all other amounts have been taken away; esp., an amount of money remaining after a sale, minus any

---

[2] The court may also impose a third-tier penalty for violations that "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons."  *See* 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii).

[3] The statutory cap for a third-tier violation can also be calculated as the defendant's "gross amount of pecuniary gain."  *See* 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii).

deductions for expenses, commissions, and taxes." *Compare Gross*, BLACK'S LAW DICTIONARY (11th ed. 2019); *with Net*, BLACK'S LAW DICTIONARY (11th ed. 2019). Accordingly, if Congress intended courts to deduct business expenses in calculating a civil penalty under the securities laws, it would have phrased the statutory cap as the defendant's "net amount of pecuniary gain" instead of his "gross amount of pecuniary gain."

It was entirely proper under the plain text of the statute for the district court to calculate Husain's "gross pecuniary gain" by using the total amount gained from the sale of the shells. "[P]ecuniary gain" is simply defined as a "[g]ain of money or of something having monetary value," *Pecuniary Gain*, BLACK'S LAW DICTIONARY (11th ed. 2019), and Husain does not dispute that the sale of the shells generated proceeds of $1,787,000. Husain argues that the statute does not allow the "gross amount of pecuniary gain" to be calculated as the "proceeds to the enterprise." But this argument ignores the fact that the "enterprise" in this case did not exist separately from Husain, and instead constituted a business that he and Jaclin formed, operated, and controlled.[4]

---

[4] The majority asserts that a genuine dispute of material fact exists regarding Husain's "gross amount of pecuniary gain" because the district court deducted Jaclin's pre-interest disgorgement settlement of $30,000 from the gross proceeds from the sale of the shell companies. Contrary to the majority opinion's suggestion, however, no legal authority requires the district court to trace Husain's "gross proceeds" to him once the district court deducted Jaclin's disgorgement. The district court arguably awarded Husain a civil penalty *below* the acceptable statutory cap of his "gross amount of pecuniary gain" of $1,787,000 by deducting Jaclin's disgorgement.

Indeed, under the securities laws, we have held that "[a] person who controls the distribution of illegally obtained funds is liable for the funds he or she dissipated as well as the funds he or she retained." *SEC v. Platforms Wireless Intern. Corp.*, 617 F.3d 1072, 1098 (9th Cir. 2010). Husain's "gain" can be appropriately calculated as the total "gain" from the shell factory scheme he orchestrated, because he concedes he was the control person disseminating the funds from the sale of the shell companies. While civil penalties may not be "imposed jointly and severally," *see SEC v. Pentagon Capital Mgmt.*, *PLC*, 725 F.3d 279, 288 (2d Cir. 2013), the total gains amassed here may properly be used to calculate Husain's "gross amount of pecuniary gain" because both Jaclin and Husain *gained* from each dollar of the sale of the shell companies, even if they ultimately disseminated those funds elsewhere. As the majority opinion acknowledges, courts have routinely calculated civil penalties based on gross pecuniary gains to *all* entities involved in a scheme, recognizing that "where multiple defendants mutually benefitted from the same gains, the best calculation of a single defendant's gain may be the total gains obtained by the group through that defendants' violations." *SEC v. Fowler,* 440 F. Supp. 3d 284, 299 (S.D.N.Y. 2020), *aff'd as modified*, 6 F.4th 225 (2d. Cir. 2021), *cert. denied*, 142 S. Ct. 590 (2021); *see also SEC v. Cole*, 661 F. App'x 52, 54 (2d Cir. 2016) (holding that the district court did not abuse its discretion in awarding $12.2 million in civil penalties to each defendant, or the "total gain to the fraudulent scheme"); *SEC v. GTF Enter., Inc.*, No. 10-CV-4258, 2015 WL 728159, at *2 n.2 (S.D.N.Y. Feb. 19, 2015) (holding that "such attribution of gains to an individual defendant is proper" in calculating "gross pecuniary gain"); *SEC v. Interlink Data Network of Los*

*Angeles, Inc.*, No. 93-3073, 1993 WL 603274, at *13 (C.D. Cal. Nov. 15, 1993) (awarding civil penalties of $12,285,053 based on the aggregate dollars invested in Interlink's common stock); *SEC v. Amerindo Inv. Advisors, Inc.*, No. 05- 5231, 2014 WL 2112032, at *11 (S.D.N.Y. May 6, 2014).

That a civil penalty may be calculated based on the gross proceeds to a scheme, without deductions, comports with the purpose and legislative history of the civil penalty statutes. Several years after empowering the SEC to seek penalties for insider trading, Congress recognized that the SEC had "very limited" authority to seek penalties for other violations of the securities laws. H.R. Rep. 101-616, at 17 (1990). To bolster the SEC's enforcement authority, Congress passed the Securities Enforcement Remedies Act and Penny Stock Reform Act of 1990 "to strengthen and broaden the SEC's enforcement powers by authorizing new civil money penalties for a range of securities violations." S. Rep. No. 101-337, at 2 (1990). In amending the law, Congress explicitly intended to award "substantial money penalties, in addition to the disgorgement of profits . . . for the deterrence of securities law violations that otherwise may provide great financial returns to the violator." H.R. Rep. No. 101-616, at 17 (1990). These remedies would empower "both the courts and the Commission with greater flexibility to tailor a remedy to the seriousness of the violation." *Id.* at 18–19.

Husain's proposed interpretation of "gross amount of pecuniary gain" contradicts the express purpose of the civil penalty statutes: to grant courts the power to award penalties that punish and deter future violations of the securities laws. Holding that a defendant's "gross amount of pecuniary gain" could not be interpreted as the gain to the "enterprise" would essentially permit defendants like Husain to funnel the

proceeds of their fraud to entities that *they themselves* established as part of the scheme, and then avoid civil penalties by claiming they never received the money. Indeed, this appears to be Husain's gambit when he claims that he did not "control" the offshore accounts of two entities that received the "gross proceeds" of the sale of the shell companies, even though he orchestrated and controlled the sale.

Because the district court's interpretation of "gross amount of pecuniary gain" comports with the plain text, purpose, and history of the civil penalty statutes, and our precedent, the district court did not err in using the sale proceeds from the shell companies in calculating Husain's "gross pecuniary gain."

B.

The majority avoids interpreting the civil penalty statutes by asserting that there are "genuine disputes of material fact" as to whether $1,757,000 represents "the gross amount of pecuniary gain to [Husain] as a result of the violation." The majority's "disputed facts" amount to a dispute about how the civil penalties statutes should be interpreted, and the majority implies, without citing any precedent or authority, that the statutes have a tracing requirement for the final disposition of ill-gotten gains. But the "disputed" facts identified by the majority are immaterial to the outcome of the case.

The majority first states that Husain's "admissions establish only that he *and Jaclin* received total sales proceeds of $1,787,000," which create a genuine issue of material fact about whether $1,757,000 represents Husain's or Jaclin's "gross pecuniary gain." Maj. Op. 15. In support, the majority relies on "Husain's declaration that legal fees of

$287,000 were paid from the sales proceeds" to argue that a genuine issue of material fact exists regarding whether the $287,000 spent on legal fees represents Jaclin's or Husain's "gross amount of pecuniary gain." Maj. Op. 18. The opinion additionally cites Husain's statements that he does "not admit or agree that [his] net proceeds, the amount that would be subject to an order of disgorgement is $1.6 [million] or is anything close to it" and his "best estimate" of his "net proceeds . . . [is] closer to $75,000." Maj. Op. 16 n.14.

However, it is immaterial whether Jaclin or Husain pocketed the legal fees of $287,000, because Husain *gained* from the value of the use of Jaclin's legal services in the sale of the shell companies, even if he did not retain $287,000 in profit. Likewise, it does not matter whether Husain "admit[s] or agree[s] that [his] net proceeds" are close to $1.6 million because the statutory cap is Husain's "*gross* amount of pecuniary gain," not his "*net* amount of pecuniary gain." As Husain admits, the purpose of the shell factory scheme was to "realize[] gross proceeds in connection" with the sale of the shell companies, and those proceeds are therefore an appropriate measure of Husain's "gross amount of pecuniary gain."

The majority opinion's analysis conflates the statutes' requirements for the calculation of disgorgement, which must be a reasonable approximation of a defendant's profits from a violation of the securities law, *see Liu v. SEC*, 140 S. Ct. 1936, 1940–41 (2020), with the calculation of civil penalties, which has no such requirement.[5] *See SEC v.*

---

[5] The majority opinion suggests that the district court confused the two requirements for disgorgement and civil penalties by basing its calculation of Husain's "gross proceeds" on "the SEC's calculation of

*Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013). Calculating an order of disgorgement requires more precision than an award of civil penalties, because disgorgement is intended as equitable relief and "equity never 'lends its aid to enforce a forfeiture or penalty.'" *Liu*, 140 S. Ct. at 1941 (quoting *Marshall v. Vicksburg*, 82 U.S. 146, 149 (1872)). In other words, disgorgement "simply restores the status quo," *id.* at 1943 (cleaned up), while civil penalties are intended to be punitive. *See Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC*, 467 F.3d 73, 81–82 (2d Cir. 2006) (discussing H.R. Rep. No. 101-616 (1990)). Reading a tracing requirement into the text of the civil penalty statutes—as the majority heavily implies we should—would contradict Congress's express intent to afford courts wide discretion in awarding substantial civil penalties for violations of securities law.[6]

---

Husain's proposed *disgorgement*." Maj. Op. 19 n.15 (emphasis in original). In fact, the district court properly construed the separate requirements. The SEC originally asked the district court to award $1,757,000 in disgorgement, or a "reasonable approximation" of Husain's profits via his proceeds, as well as $1,757,000 in civil penalties equivalent to his "pecuniary gain." Dist. Ct. Dkt. 97-1 at 20–23. In the interim, the Supreme Court decided *Liu*, which clarified that disgorgement should be limited to a defendant's "net profits." *Liu*, 140 S. Ct. at 1946. As the SEC had originally calculated Husain's disgorgement as his "gross proceeds," the SEC requested that the district court reopen discovery to determine Husain's "net profits." The district court denied the SEC's request for disgorgement, finding that the $1,757,000 civil penalty—or Husain's "gross proceeds"—was "sufficient punishment and deterrence to address Husain's violations of the securities law."

[6] Husain separately argues that the Supreme Court's decision in *Liu* demonstrates that there is a "distinction between gross receipts and the defendant's 'gross amount of pecuniary gain.'" In *Liu*, the Supreme Court imposed two limitations on disgorgement. First, that a violator

It is similarly irrelevant that Husain disputes that he controlled two of the offshore accounts—Ucino and Liric—that received payments for the shell companies. Husain admitted that, in the majority opinion's words, he had "final authority" over the shells, which he sold for the purpose of profiting from his fraudulent scheme. Maj. Op. 5, 15. He stated in his declaration that he "made no secret about the fact or extent of [his] involvement as a 'control person' in these transactions" and that, "[i]n all cases, [he] dealt directly at some point with the purchasers/investors who knew that [he] was the control person." Husain also admits that Ucino and Liric were "affiliated with" him, that he "exercised influence" over them, and that he was the main signatory on the Ucino account. The only evidence that Husain did not "control" Ucino and Liric is his conclusory statement in his declaration that he did not control them. But "conclusory allegations unsupported by factual data are insufficient to defeat . . . [a] summary judgment motion."

could only be held liable "for benefits that accrue to his affiliates" because a theory of joint-and-several liability would be "at odds with the common-law rule requiring individual liability for wrongful profits." *Liu*, 140 S. Ct. at 1949. Second, the Court held that "courts must deduct legitimate expenses before ordering disgorgement." *Id.* at 1950.

But *Liu* addressed only disgorgement, not the imposition of civil penalties, and disgorgement is not at issue in this case. Disgorgement focuses on "simple gains," not the "gross amount of pecuniary gains." *Amerindo*, 2014 WL 2112032, at *11. Indeed, "nothing in *Liu* disturbs the Court's power to order civil penalties." *SEC v. Penn,* No. 14-581, 2021 WL 1226978, at *14 n.23 (S.D.N.Y. Mar. 31, 2021); *see also SEC v. de Maison*, No. 18-2564, 21-620, 2021 WL 5936385, at *2 (2d Cir. Dec. 16, 2021) ("By emphasizing that equitable disgorgement is limited to the 'net profits from wrongdoing,' the Supreme Court severed any equation of disgorgement amounts from the '*gross* amount of pecuniary gain,' that constitutes the maximum civil penalty for a third-tier civil violation." (internal citations omitted)).

*Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001).

Accordingly, the majority's asserted disputed "facts" are material only if we depart from the courts' interpretations of "gross amount of pecuniary gain" to read a tracing requirement into the text of the statute. And that is an interpretation we must reject as the statutes' plain text, as well as precedent, has no such requirement for the calculation of civil penalties. As the sale of Husain's shell companies undisputedly grossed $1,787,000, the district court properly determined Husain's "gross amount of pecuniary gain" in the first instance, and it is unclear from the majority opinion what relevant facts the district court could uncover on remand.

## III.

In addition to determining that Husain's "gross pecuniary gain" was undisputedly $1,787,000, the district court determined that Husain deserved the maximum civil penalty by weighing the five factors set out in *Murphy*, which include assessing a defendant's scienter and contrition. The majority holds that Husain established genuine issues of material fact regarding the "degree of [his] scienter and his recognition of the wrongful nature of his conduct." Maj. Op. 20. The majority reasons that the district court impermissibly assessed Husain's "credibility" when evaluating his contrition and scienter on a summary judgment record. In doing so, the majority improperly relies on *SEC v. Koracorp Industries*, 575 F.2d 692 (9th Cir. 1978), a case we have rejected as applying in this context.

While the majority correctly identifies the proper standard of review for the determination of civil penalties—abuse of discretion—it improperly reviews the district

court's *Murphy* analysis de novo to reverse the court's weighing of the factors. Here, we have an uncontroverted record as to Husain's culpability. In such a case, our precedent holds that the district court properly may balance uncontroverted record facts to assess a defendant's credibility to determine a remedy on summary judgment. *See Murphy II*, 50 F.4th at 847, 851. The majority does not identify any evidence that warrants reversing the district court on the "highly deferential standard" of abuse of discretion. *Gonzales v. Free Speech Coal.*, 408 F.3d 613, 618 (9th Cir. 2005).

## A.

To determine a remedy for a violation of the securities laws, the *Murphy* test requires that courts "assess the totality of the circumstances surrounding the defendant and his violations" and weigh "the degree of scienter involved; the isolated or recurrent nature of the infraction; the defendant's recognition of the wrongful nature of his conduct; the likelihood that, because of the defendant's professional occupation, future violations may occur; and the sincerity of his assurances against future violations." *Murphy*, 626 F.2d at 655. While the *Murphy* court originally applied the test to determine whether injunctive relief was appropriate, courts in the Ninth Circuit "routinely consider the five factors established in *SEC v. Murphy*" to calculate civil penalties. *SEC v. Wilde*, No. 11-0315, 2012 WL 6621747, at *16 (C.D. Cal. Dec. 17, 2012), *aff'd sub nom. SEC v. Wilde*, 669 F. App'x 423 (9th Cir. 2016); *see also SEC v. mUrgent Corp.*, No. 11-0626, 2012 WL 630219, at *2 (C.D. Cal. Feb. 28, 2012) ("Like a permanent injunction, civil penalties are designed to deter the wrongdoer from similar violations in

the future, so courts frequently apply the factors set forth in *SEC v. Murphy*.").[7]

The majority opinion incorrectly states that "[w]e have not previously addressed" what standard of review applies to the district court's weighing of factual findings under the *Murphy* factors. Maj. Op. 12. As we held *just last October*, we review "the district court's remedies decision for an abuse of discretion" absent a question of law regarding the civil penalty statutes. *Murphy II*, 50 F.4th at 842 (citations omitted); *see also SEC v. Yang*, No. 21-55437, 2022 WL 3278995, at *2 (9th Cir. Aug. 11, 2022) (affirming a civil penalty of $1,938,600, noting that the district court did not abuse its discretion in "determin[ing] that a gross pecuniary gain penalty was appropriate in light of all the *Murphy* factors"); *SEC v. Feng*, 935 F.3d 721, 737 (9th Cir. 2019); *Platforms Wireless*, 617 F.3d at 1096.[8]

---

[7] There is a wealth of district court orders in our circuit weighing the *Murphy* factors to determine the amount of civil penalties, including summary judgment orders. *See, e.g.*, *SEC v. CMKM Diamonds, Inc.*, 635 F. Supp. 2d 1185, 1193 (D. Nev. 2009) ("Given the gravity of their actions, the extent of their fraud, and the magnitude of their unjust enrichment, penalties equal to each defendant's gross pecuniary gain is warranted. The *Murphy* factors confirm the propriety of this calculation."); *SEC v. Blockvest, LLC*, No. 18-2287, 2020 WL 7488067, at *5 (S.D. Cal. Dec. 15, 2020) ("[C]ourts frequently apply the *Murphy* factors for permanent injunctions when assessing civil penalties."); *SEC v. Flowers*, No. 17-1456, 2018 WL 6062433, at *6 (S.D. Cal. Nov. 19, 2018) (same).

[8] Our sister circuits additionally review a courts' remedies decision under the civil penalty statutes for an abuse of discretion on summary judgment. *See SEC v. Rajaratnam*, 918 F.3d 36, 41 (2d Cir. 2019); *SEC v. Warren*, 534 F.3d 1368, 1369 (11th Cir. 2008) (per curiam). The Second Circuit has notably adopted a functionally identical version of the *Murphy* factors to assess civil penalties, which are also reviewed for

In *Murphy II*, we held that a district court did not abuse its discretion in imposing injunctive relief and civil penalties for three individuals—including an award of $1,761,920 in civil penalties—that were calculated under the *Murphy* factors on a summary judgment record. *Murphy II*, 50 F.4th at 842. First, we held that "[w]e review a district court's grant of summary judgment" on securities law violations "de novo," but review "the district court's remedies decision for an abuse of discretion" absent "legal issues, such as whether a remedy violates a statute or the Constitution," which are reviewed de novo. *Id.* Relying on the wide scope of the Murphys' undisputed violations, we next held that the district court did not "*abuse its discretion*" in awarding substantial civil penalties. *Id.* at 849 (emphasis added). Turning to the district court's injunctive relief determination, we held that the district court did not abuse its discretion in determining the Murphys' degree of contrition under the *Murphy* factors, even in the face of their argument that "the district court impermissibly weighed credibility at the summary judgment stage by discounting their assurances against future violations." *Id.* at 851. As "the Murphys'

---

an abuse of discretion. In *SEC v. Haligiannis*, the court assessed a civil penalty against a defendant in the amount of $15,000,000 on summary judgment by looking to a number of factors, including "(1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition." 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007) (citing Second Circuit cases). The Second Circuit has reviewed a calculation of culpability under the *Haligiannis* factors and affirmed a civil penalty award as high as $92,805,705, equal to the amount of the defendant's "gross amount of pecuniary gain" on summary judgment. *See, e.g.*, *Rajaratnam*, 918 F.3d at 45–46.

assurances are contradicted by their current involvement in the securities industry and apparent failure to appreciate the wrongfulness of their past conduct," we held that "the district court acted within its discretion by imposing injunctive relief." *Id.* at 852.

While in *Murphy II* we reviewed the district court's analysis of the *Murphy* factors for an abuse in discretion in the context of injunctive relief on summary judgment, the *Murphy* test likewise applies to civil penalties. Thus, we review a district court's *Murphy* factor analysis for an abuse of discretion, even where a defendant disputes the district court's underlying determinations as to the degree of scienter or contrition.

B.

There is no genuine dispute of material fact as to Husain's scienter, as he conceded his scienter in his guilty plea to obstruction of justice, his sworn declaration in the civil action, and his Opening Brief, which states in relevant part that "it is a given here that Husain qualifies (for most of the shell companies) for the second tier and had meaningful scienter." The majority contends that "Husain raised a genuine issue of material fact on the degree of scienter" because his sworn declaration blames Jaclin as his lawyer for instructing him to lie on his SEC forms and indicates "that he only intended to deceive the SEC, not investors." Maj. Op. 23. However, we have held that scienter under the securities laws does not turn on a defendant's "intent to defraud" specific investors, *see Vernazza v. SEC*, 327 F.3d 851, 860 (9th Cir. 2003), but instead on whether a defendant intended to engage in the unlawful scheme and make false and misleading statements to the SEC. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007)

(describing scienter as "a mental state embracing intent to deceive, manipulate, or defraud" (citation and internal quotation marks omitted)); *Platforms Wireless*, 617 F.3d at 1092 ("Scienter can be established by intent, knowledge, or in some cases 'recklessness.'" (citation omitted)).

Here, it is undisputed that: Husain knowingly recruited and installed nominal CEOs for shell companies that he actually controlled and had final authority over; he assembled straw shareholders who did not use their own money to purchase the shares of shell companies; he knowingly filed dozens of false registration statements and reports with the SECs; and then obstructed justice by coaching the testimony of the companies' puppet CEOs, creating burner e-mail accounts, and hiring consultants to scrub his emails—all to intentional*y* conceal his fraudulent conduct. The district court weighed Husain's declaration against his uncontroverted and admitted actions, and found that the evidence conclusively established that Husain knowingly engaged in a fraudulent shell factory scheme aimed at deceiving the SEC. As a result, the district court did not abuse its discretion in finding that Husain acted with a high degree of scienter.

## C.

There is likewise no genuine dispute of material fact regarding Husain's contrition. The majority holds that Husain created a genuine dispute of material fact regarding his contrition because of his declaration, which claims that he is "remorseful," and because the district court failed to identify "undisputed evidence that Husain's scheme victimized individual investors." Maj. Op. 22.

The majority's "disputed facts" are again disagreements with how the district court balanced undisputed facts in the

record to assess Husain's contrition. As we held in *Murphy*, however, Husain should not be able to avoid liability by creating unsubstantiated disputes of material fact in a sworn declaration, including through mere "statements of reformation." *Murphy*, 626 F.2d at 656. Moreover, the district court *did* acknowledge Husain's expressions of remorse, but weighed his claims of remorse against his undisputed actions and other uncontroverted statements. Importantly, the district court found that "Husain fail[ed] to recognize the wrongful nature of his conduct" by failing to "acknowledge that there were victims of his fraudulent scheme" including the "impact of his illegal conduct on the market's integrity."

There is no evidence in the record that Husain ever admitted responsibility for the impact of his actions on market integrity, and plenty of undisputed evidence that he never took responsibility. For example, during the pendency of this action, Husain labeled his conduct only a "mistake," blamed Jaclin by arguing that Jaclin's conduct was "actually *more* serious" than his, and then stated that he "did not cause any investors or the investing public to experience losses." Indeed, Husain's continued insistence that there were no "victims" of his misconduct underscores his lack of contrition. The securities laws are intended to protect not only individual victims of fraud but also "'to insure honest securities markets and thereby promote investor confidence.'" *SEC v. Zandford*, 535 U.S. 813, 819 (2002) (quoting *United States v. O'Hagan*, 521 U.S. 642, 658 (1997)). Husain only expressed contrition for deceiving the SEC, not for the impact of his actions on the public trust.

Further, as the district court noted, Husain "only stopped his scheme because he got caught." We have held that "[p]romises of reformation and acts of contrition" are not

"conclusive or even necessarily persuasive, especially if no evidence of remorse surfaces until the violator is caught." *Koracorp Indus.*, 575 F.2d at 698. The district court weighed Husain's uncontroverted actions and statements against the late-in-the-day statements of remorse in his declaration and found Husain's statements of remorse lacking. Such an assessment of contrition under the *Murphy* factors is not an abuse of discretion on summary judgment, but exactly what the *Murphy* test demands to assess civil penalties.

D.

The heart of the majority's argument rests on the proposition that any assessment of the defendant's "credibility"—including his degree of scienter or contrition—is almost always inappropriate on a summary judgment record. The majority's logic could effectively preclude any court from awarding injunctive relief or maximum civil penalties without an evidentiary hearing, even for confessed violations of the securities laws, because assessing the *Murphy* factors requires that the district court weigh evidence of a defendant's scienter and contrition.[9]

---

[9] The majority opinion also implies that the district court erred by failing to assess Husain's credibility "in the light most favorable to [him]." Maj. Op. 23 n.19. But assessing a defendant's scienter or contrition under the *Murphy* factors on summary judgment does not mean giving a defendant a free pass where there are no genuine disputes of material fact. Like Husain, the defendants in *Murphy* and *Murphy II* disputed the degree of their scienter and contrition in sworn declarations, yet we affirmed in both cases that it was entirely proper for the district court to weigh those declarations unfavorably against the defendants' undisputed actions. *See Murphy*, 626 F.2d at 656; *Murphy II*, 50 F.4th at 851. The majority opinion's logic effectively means that no district court could ever award sweeping injunctive relief or maximum civil penalties on summary

And, as we held in *Murphy* and *Murphy II*, an evidentiary hearing is not required to determine a remedy for violations of the securities laws under the *Murphy* factors.

In *Murphy* itself, for example, the district court concluded that injunctive relief was appropriate on a summary judgment record. Murphy appealed, arguing that his "statements of reform" in a sworn affidavit created a genuine dispute of material fact regarding his contrition. *Murphy*, 626 F.2d at 656. Murphy relied upon the same passage from *Koracorp Industries* quoted by the majority, which states that "courts have long recognized that summary judgment is singularly inappropriate where credibility is at issue." 575 F.2d at 699. Distinguishing *Koracorp Industries*, we rejected Murphy's argument that "credibility" could not be assessed on a summary judgment record:

> Murphy's argument cannot prevail. One obvious problem with his position is that it implies that a defendant may always defeat a permanent injunction on summary judgment if he merely states under oath that he will not commit violations in the future. If the SEC were to resolve all other issues on summary judgment, such a rule could prevent the Commission from attempting to gain permanent injunctions on motions for summary judgment in those cases when the clearest violations have been committed . . . .

---

judgment, as every defendant would simply create dubious disputes of material fact regarding their scienter or contrition in sworn declarations.

> This case is clearly distinguishable from *SEC v. Koracorp Industries, Inc.*, [] on which Murphy relies heavily.  In *Koracorp*, this court reversed the grant of a summary judgment for defendants on the injunction issue, because there was tremendous dispute about the culpability of each of the defendants, in addition to the question of the bona fides of their statements of intent to comply.  It was impossible for the trial court on summary judgment to balance the culpability against the statement of reformation.  In Murphy's case, however, his culpability for the registration violation was established conclusively, and the trial judge could properly decide that he would grant the permanent injunction whether he believed Murphy or not.

626 F.2d at 656–57.

In *Murphy II*, we again rejected an argument that the district court improperly weighed the defendants' "credibility" by assessing their contrition, upholding the grant of an injunction under the *Murphy* factors.  *Murphy II*, 50 F.4th at 851.  We distinguished *Koracorp* because "there is no dispute here over the Murphys' role in the [] scheme, and their culpability is not at issue."  *Id.* at 852. Similarly, in *SEC v. M & A West, Inc.*, 538 F.3d 1043 (9th Cir. 2008)— which the majority also relies upon—the defendant's culpability was also at issue.  There, the defendant Medley, an underwriter, presented legal opinions that demonstrated that he may have acted in good faith and did not understand his actions violated securities laws.  *Id.* at 1054.  As

Medley's scienter was genuinely in dispute, we remanded his case for an evidentiary hearing. *Id.* at 1055.

But here, there is no genuine dispute as to Husain's culpability because he confessed to his actions and knowing state of mind. And it is entirely permissible, and even encouraged in the interest of judicial efficiency, for the district court to weigh a defendant's statements denying responsibility against his uncontroverted actions and assess a remedy under the *Murphy* factors on summary judgment.

## IV.

Perhaps the majority's concern in this case stems from a sense that Husain received an outlier punishment for his pattern of admitted misconduct. The majority's sympathies are misplaced, however, because civil penalties in excess of $1 million are commonplace for violations of the securities law, even on summary judgment.[10]   Here, Husain engaged

---

[10] *See, e.g.*, *Murphy II*, 50 F.4th at 848 (affirming tier-one civil penalties of $1,761,920); *SEC v. Alpine Sec. Corp.*, 982 F.3d 68, 85 (2d Cir. 2020) (affirming that it was not an abuse of discretion to award tier-one civil penalties in the amount of $12,000,000 on a summary judgment record); *Rajaratnam*, 918 F.3d at 39 (affirming a civil penalty of $92,805,705 on summary judgment); *CMKM Diamonds, Inc.*, 635 F. Supp. 2d at 1194 (ordering on summary judgment a civil penalty of the defendant's "gross pecuniary gain" of $26,400,000); *Haligiannis*, 470 F. Supp. 2d at 386 (ordering on summary judgment a civil penalty of $15,000,000 equal to the defendant's pecuniary gain); *SEC v. Kenton Capital, Ltd.*, 69 F. Supp. 2d 1, 17 (D.D.C. 1998) (imposing civil penalties of $1,200,000 on a summary judgment record);  *SEC v. Invest Better 2001*, No. 01- 11427, 2005 WL 2385452, at *5 (S.D.N.Y. May 4, 2005) (imposing a "civil penalty of $1,273,731" on summary judgment); *SEC v. Credit Bancorp*, No. 99-11395, 2002 WL 31422602, at *2–3 (S.D.N.Y. Oct. 29, 2002) (authorizing a maximum penalty of "gross pecuniary gain" on summary judgment); *SEC v. Milan Grp., Inc.*, 124 F. Supp. 3d 21, 27 (D.D.C. 2015) (same).

in a years-long scheme aimed at defrauding the SEC and the investing public, and only stopped his conduct after he got caught.    Considering "the facts and circumstances" of Husain's particular case, *see* 15 U.S.C. §§ 77t(d)(2), 78u(d)(3)(B), a penalty of $1,757,000 is proportional to the degree of Husain's misconduct, and certainly not an abuse of discretion.

While the majority attempts to reframe this case as a question of disputed fact, its approach is wrong as a matter of law.    Ignoring the plain text of the statute and past precedent, the majority misinterprets the statutory requirements under the securities laws for the calculation of civil penalties.    And recent precedent forecloses the majority's blinkered understanding that a district court should not assess credibility on summary judgment, even where that credibility assessment comes from weighing undisputed and admitted facts and statements in the record. If we accept the majority's interpretation of the *Murphy* test, it would likely "prevent the Commission from attempting to gain [civil penalties] on motions for summary judgment in those cases when the clearest violations have been committed." *Murphy*, 626 F.2d at 656.    This will result in wasteful evidentiary hearings and will thwart the SEC's ability to punish the most flagrant and obvious violations of the securities laws.

Because the district court did not abuse its discretion in assessing an award of $1,757,000 in civil penalties against Husain, and the majority's holdings are foreclosed by controlling precedent, I respectfully dissent.