FOR PUBLICATION

# UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, *Plaintiff - Appellee*, v. BRENDA CHRISTINE BARRY; ERIC CHRISTOPHER CANNON; CALEB AUSTIN MOODY, DBA Sky Stone, *Defendants - Appellants*, and PACIFIC WEST CAPITAL GROUP, INC., ANDREW B. CALHOUN IV, PWCG TRUST, BAK WEST, INC., ANDREW B. CALHOUN, Jr., CENTURY POINT, LLC, MICHAEL WAYNE DOTTA, *Defendants*. | No. 23-2699 D.C. No. 2:15-cv-02563-DDP-AS OPINION |

Appeal from the United States District Court
for the Central District of California
Dean D. Pregerson, District Judge, Presiding

Argued and Submitted December 6, 2024
Pasadena, California

Filed August 11, 2025

Before: Ronald M. Gould, Richard R. Clifton, and Gabriel
P. Sanchez, Circuit Judges.

Opinion by Judge Clifton

## SUMMARY[*]

### Securities Law

The panel affirmed the district court's summary judgment in favor of the Securities and Exchange Commission (SEC) in the SEC's action alleging that Defendants, who were sales agents for Pacific West Capital Group (PWCG), violated federal securities laws by offering and selling unregistered securities and by not being properly registered as broker-dealers.

Defendants promoted and sold fractional interests in life settlements. The district court held that PWCG's life settlements were securities under the Securities Act of 1933

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

and that Defendants had not established an applicable exemption from the securities laws' registration requirements.

The panel held that fractional interests in life settlements are investment contracts, and thus securities, under the federal securities laws. Three features of PWCG's life settlements—its selection of specific policies on certain terms, its construction and operation of its premium reserve system, and the fractionalized nature of the interests— together satisfy the *Howey* test's requirements that profits come "from the efforts of others." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946).

The panel held that PWCG's issue of fractional interests in life settlements was not exempt from the federal securities laws' registration requirements. PWCG's life settlements shared a financing scheme, were the same type of security, and were offered to at least one out-of-state resident. Therefore, PWCG's offerings were part of an integrated, interstate offering.

Defendants argued that the district court erred in awarding disgorgement because disgorgement requires pecuniary harm to victims and no pecuniary harm existed. The panel affirmed the district court's finding of pecuniary harm because buyers of PWCG's fractional interests in life settlements suffered pecuniary harm through the loss of the time value of their money.

Finally, the panel affirmed the district court's imposition of an injunction against Defendant Eric Cannon and civil penalties against all three Defendants.

# COUNSEL

Kerry J. Dingle (argued), Senior Appellate Counsel; Jordan A. Kennedy, Appellate Counsel; Daniel Staroselsky, Assistant General Counsel; Tracey A. Hardin and Michael A. Conley, Solicitors; Megan Barbero, General Counsel; Securities and Exchange Commission, Washington, D.C.; Kathryn C. Wanner, Securities and Exchange Commission, Los Angeles, California; for Plaintiff-Appellee.

Igor V. Timofeyev (argued), Paul Hastings LLP, Washington, D.C.; Alyssa K. Tapper and Alexander Sweet, Paul Hastings LLP, Los Angeles, California; Nicolas Morgan, Investor Choice Advocates Network, Los Angeles, California; for Defendants-Appellants.

Gregory Nolan, Kenneth P. White, and Tyler C. Creekmore, Brown White & Osborn LLP, Los Angeles, California, for Amicus Curiae Ongkaruck Sripetch.

**OPINION**

CLIFTON, Circuit Judge:

Pacific West Capital Group (PWCG), a California corporation, sold fractional interests in life settlements to investors. A life settlement is a transaction in which a person who owns a life insurance policy on his or her own life sells that policy to investors for a negotiated price. Thereafter, the investors pay the premiums on the policy until the insured dies, at which point those investors receive the policy's death benefit.

We conclude that the fractional interests in the life settlements sold by PWCG were "investment contracts" and thus securities subject to the registration requirements of the Securities Act of 1933. In our view, as we discuss below, these investments were securities because the purchasers of the fractional interests sold by PWCG depended on the efforts of PWCG to profit through PWCG's selection of policies, its determination of prices to be paid for those policies, and its premium reserve system to maintain investors' fractional interests. Other circuits have previously divided over the question of whether life settlements are securities subject to registration. In concluding that the fractional interests were securities, we join the Eleventh and Fifth Circuits and depart from a conclusion reached by the D.C. Circuit.

Defendants-Appellants Brenda Barry, Eric Cannon, and Caleb Moody (collectively Defendants) were sales agents for PWCG who promoted and sold fractional interests in life settlements. The Securities and Exchange Commission (SEC) alleged that Defendants violated federal securities laws by offering and selling unregistered securities and by

not being properly registered as broker-dealers. The district court granted summary judgment to the SEC, concluding that PWCG's offerings and sales of fractional interests in life settlements were offerings of unregistered securities and that the sales were not exempt from registration under the intrastate offering exemption. As remedies, it ordered disgorgement of a portion of the commissions received by the Defendants, imposed civil penalties against each of the Defendants, and enjoined Cannon from future violations of the securities laws. We affirm.

## I.  Background

Life settlements emerged from "viatical settlements," which were transactions that arose during the 1980s AIDS crisis in which terminally ill patients sold their life insurance policies to investors. Joy D. Kosiewicz, *Death for Sale: A Call to Regulate the Viatical Settlement Industry*, 48 CASE W. RSRV. L. REV. 701, 701-02 & n.4 (1998). Some people suffering from the disease needed money because the illness often made it hard for them to work and imposed heavy medical costs. *See SEC v. Life Partners, Inc.*, 898 F. Supp. 14, 17 (D.D.C. 1995). An insured could "surrender" their policy to the issuing life insurance company for a fraction of the policy's value. For a larger fraction, however, an insured could sell the policy to others, such as investors. As PWCG's promotional brochure explained, using hypothetical numbers, "Now, instead of being able to receive only $100,000 on a $1,000,000 policy [from the life insurance company], the insured might expect to receive $250,000 from investors." Life settlements allow insureds to get more money for their policies from private investors than they could otherwise receive from their life insurance companies.

In exchange for paying the insured for their policy and taking on the responsibility of paying the premiums, the investor receives the death benefit after the insured dies. The investor profits if the insured dies early enough to outweigh the cost of the policy and its premiums. As the Fifth Circuit explained, "To put it bluntly, a life settlement is a bet on the length of the insured's life." *Living Benefits Asset Mgmt. v. Kestrel Aircraft Co.*, 916 F.3d 528, 531 (5th Cir. 2019).

PWCG promoted and sold fractional interests in life settlements and structured the payment of their premiums. Life settlement brokers and resellers sent medical and policy information about insureds to PWCG to see if it was interested in purchasing them to sell to its own investors. According to one of its promotional brochures, PWCG reviewed policies every month that were collectively worth hundreds of millions of dollars for investment opportunity. PWCG explained it would invest only in those policies where the insureds were at least 75 years old, the insurance company was reputable, and the policies were not subject to loopholes that could restrict payouts. The brochure stated, "Policies offered by PWCG have a minimum total fixed return of 100%, meaning investors will double their money." PWCG reviewed insureds' medical records to assess the likelihood that insureds would die in four to seven years from the date of purchase, though PWCG did not engage medical professionals to do so.

PWCG established a trust, PWCG Trust, to be the policies' owner and beneficiary, and it appointed as trustee a company with experience administering life settlements, Mills, Potoczak & Co. (Mills Potoczak). PWCG and Calhoun identified policies for PWCG Trust to purchase. PWCG then offered its investors fractional shares in PWCG Trust's beneficiary interests in specific policies. Mills

Potoczak assigned those fractional shares of a particular policy's death benefit to the purchasing investors. As trustee, Mills Potoczak administered premium payments, monitored whether the insured died, and distributed the payouts upon an insured's death. Paying the insurance policies' premiums was essential to the profitability of life settlements because otherwise the policies risked lapsing and future benefits would be lost.

To fund its payment of life settlement premiums, PWCG used investor proceeds to create what it described as a "three-tiered premium reserve system that is unique in the industry." The first tier, the "primary premium reserve," held enough money to pay the premiums on a policy for six to nine years. The second tier, called the "first general reserve," comprised "1% of all investor money for all policies." If PWCG and Mills Potoczak depleted the money from the first tier, then the second tier would be drawn upon to make premium payments. If both the first and second tiers ran out of money, then the third tier, the "second general reserve," would contribute. The third tier was funded by money from the first tier of other policies whose insureds had died before their corresponding first tier funds ran out. PWCG could also make "premium calls" requiring investors to put in more money to pay policies' premiums if the premium reserve system failed.

The system failed. While PWCG intended to buy policies covering insureds who would die within four to seven years, too many of the original insureds lived longer than that. PWCG's primary reserve system could not make the required premium payments. PWCG turned to the next two tiers, drawing down the secondary and tertiary reserves. When the reserves ran out, PWCG resorted to premium calls or used proceeds from the sale of new policy interests to pay

for existing premiums. Around 150 investors received premium calls, totaling more than $1.7 million. Those who did not answer premium calls were told they had lost their investments. A receiver was later appointed by the district court to take over management of PWCG Trust. The receiver said that PWCG's failed bets on insureds' lifespans, as well as PWCG's "failing to engage in the high level of management required to maintain the Policies," had "predestined the shortfalls in reserves amounts for each of the Policies."

In April 2015, the SEC sued PWCG, PWCG Trust, PWCG founder Andrew B. Calhoun IV (Calhoun), Andrew Calhoun Jr. (Calhoun's father), Michael Dotta, and the current Defendants-Appellants: Barry, Cannon, and Moody.[1] The SEC alleged, in relevant part, that PWCG, Calhoun, Calhoun Jr., Dotta, and Defendants violated Sections 5(a) and (c) of the Securities Act of 1933 by offering and selling unregistered securities, 15 U.S.C. §§ 77e(a), 77e(c), and Section 15(a) of the Securities and Exchange Act of 1934 (Exchange Act) by failing to register as broker-dealers, 15 U.S.C. § 78o(a). The SEC also charged PWCG and Calhoun with securities fraud and Calhoun with controlling person liability. All parties other than the three current Defendants have settled or been dismissed. PWCG and Calhoun each agreed to millions of dollars in disgorgement and hundreds of thousands of dollars in penalties to account for the fraud-based charges. The SEC's settlement with PWCG Trust included appointing the

---

[1] In its complaint, the SEC also named two companies, BAK West and Century Point, that received Barry's and Cannon's commissions from PWCG. On appeal here are only Defendants-Appellants Barry, Cannon, and Moody.

receiver over the Trust. The three current Defendants, who played no managerial role at PWCG and against whom the SEC alleged only nonfraud violations, are the only defendants who remain.

The current appeal results from two orders of the district court from 2023. The first granted the SEC's renewed motion for summary judgment and denied Defendants' cross-motion for summary judgment. The district court held that PWCG's life settlements were securities under the Securities Act of 1933 and that Defendants had not established an applicable exemption from the securities laws' registration requirement. The second order required Defendants to disgorge one-third of the commissions they received selling PWCG's life settlements, pay civil penalties of $15,000 each, and enjoined Cannon from future violations of the securities laws. We have jurisdiction under 28 U.S.C. § 1291. We affirm.

## II. Discussion

We review a district court's grant of summary judgment de novo. *SEC v. Belmont Reid & Co., Inc.*, 794 F.2d 1388, 1390 (9th Cir. 1986). We also review de novo a district court's "determination whether a transaction is a security." *Id.* We review remedies ordered by the district court under the Securities Act and the Exchange Act for abuse of discretion. *SEC v. Husain*, 70 F.4th 1173, 1180 (9th Cir. 2023).

### A. Investment Contract

We start with the question of whether fractional interests in life settlements are investment contracts, and thus securities, under the federal securities laws. We conclude that they are.

The Securities Act of 1933 defines a security broadly as including an "investment contract." 15 U.S.C. § 77b(a)(1). In *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), the Supreme Court interpreted "investment contract" to mean "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *Id.* at 298-99. The *Howey* test has three elements: first, an investment of money in, second, a common enterprise, and third, the "profits were to come solely from the efforts of others." *SEC v. Eurobond Exch., Ltd.*, 13 F.3d 1334, 1338 (9th Cir. 1994). This third element is often described as the "efforts of others" requirement and is the only element of the *Howey* test at issue here.

The *Howey* test's broad definition, the Court explained, "permits the fulfillment of the statutory purpose of compelling full and fair disclosure relative to the issuance of the many types of instruments that in our commercial world fall within the ordinary concept of a security." *Howey*, 328 U.S. at 299 (internal quotation marks omitted). The definition "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Id.* The Supreme Court has since commanded that "form should be disregarded for substance and the emphasis should be on economic reality." *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967).

Whether an investor's expectations of profits are "solely from the efforts of the promoter or a third party" does not require that the efforts of others be the *only* factor for profit but "whether the efforts made by those other than the investor are the *undeniably significant ones*, those essential

managerial efforts which affect the failure or success of the enterprise." *SEC v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476, 482 (9th Cir. 1973) (emphasis added). Investors' expectations can be established through promoters' representations in materials such as brochures, advertisements, oral statements, or contracts. *See Hocking v. Dubois*, 885 F.2d 1449, 1457 (9th Cir. 1989); *Eurobond*, 13 F.3d at 1341.

*Howey*'s "efforts of others" element turns on the source of an enterprise's profits. If an enterprise's profit comes from developments outside of the promoter's control, then the transaction is not an investment contract. For example, in *SEC v. Belmont Reid & Co., Inc.*, we held that the sale of gold coins for a fixed price was not an investment contract because the purchasers' opportunity to profit came from increases in the global price for gold and not the efforts of the promoter who sold gold to the investor. 794 F.2d at 1391. Similarly, in *Noa v. Key Futures Inc.*, 638 F.2d 77 (9th Cir. 1980), we held that the sale and storage of silver bars for investors was not an investment contract because the profit depended on fluctuations in the global market for silver and not on Key Futures' managerial or entrepreneurial effort. *Id.* at 79-80.

In contrast, if an investor is dependent on a seller to provide efforts that could lead to profits, then the *Howey* "efforts of others" requirement is satisfied. We have explained that a key factor for satisfying the efforts-of-others inquiry is when a promoter has "practical," *SEC v. Goldfield Deep Mines Co. of Nev.*, 758 F.2d 459, 464 (9th Cir. 1985), or "complete control," *SEC v. R. G. Reynolds Enters., Inc.*, 952 F.2d 1125, 1131 (9th Cir. 1991), over the enterprise and its profitability. We have held that the efforts of others could be seen in a promoter's sale of foreign government bonds,

financed by foreign currency loans, because "any profits to investors came from the efforts and expertise of" the promoter who chose when to purchase the bonds, which bonds, how many, when to take out a loan, and what currency the loan should be in, among other factors. *Eurobond*, 13 F.3d at 1341; *see also Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Daniel*, 439 U.S. 551, 562 (1979) (holding that a pension plan is not an investment contract because whether an employee profits "would depend primarily on the employee's efforts to meet the vesting requirements, rather than the fund's investment success").[2]

The district court here concluded that PWCG's efforts in choosing which policies to offer investors using its own selection criteria, coupled with investors' lack of control over which policies PWCG selected, supported the conclusion that investors were reliant on PWCG's efforts to profit. Further, the establishment and operation of the premium reserve system by PWCG represented "the kind of 'essential managerial' efforts that the 'efforts of others' element requires." In concluding that life settlements are investment contracts under the federal securities laws, the district court's decision aligned with opinions of the

---

[2] An investment contract is distinguishable from an ordinary sale-of-goods or services contract because investors in investment contracts are motivated by "financial returns on their investments" and not "a desire to use or consume the item purchased." *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852-53 (1975). If a transaction merely resembles "any sale-of-goods contract in which the buyer pays in advance of delivery and the ability of the seller to perform is dependent, in part, on both his managerial skill and some good fortune," then the efforts-of-others test is not met. *See Belmont Reid*, 794 F.2d at 1391.

Eleventh and Fifth Circuits and departed from a contrary opinion of the D.C. Circuit.

We agree with the conclusion of the district court that the fractional interests in life settlements offered and sold by PWCG were investment contracts and thus securities. As we discuss below, three features of PWCG's life settlements—its selection of specific policies on certain terms, its construction and operation of its premium reserve system, and the fractionalized nature of the interests—together satisfy the *Howey* test's requirement that profits come "from the efforts of others." *Howey*, 328 U.S. at 301.[3]

### 1.  Selection and Purchase of Policies

PWCG's selection of life insurance policies, including the evaluation of insureds and the terms of their policies and the negotiation of the price paid for the policies, demonstrates the critical nature of the efforts of PWCG. It is a given that everyone will die at some time. Whether a specific life settlement will be profitable depends on choosing those policies that will pay out death benefits soon enough to make it worth the negotiated price of purchasing the life settlement and paying the policy's premiums until the insured's death.

PWCG selected which policies to purchase and negotiated the prices it paid for those policies. PWCG reviewed insureds' ages, medical records, and family histories, among other data, and bought policies only of the

---

[3] We do not consider whether any one feature would alone be sufficient under the test. *But see Living Benefits Asset Mgmt.*, 916 F.3d at 541 (holding that the life settlements there were securities based only on pre-purchase selection and no post-purchase efforts and rejecting explicitly the D.C. Circuit's *Life Partners* pre-/post-purchase distinction); *see also* below at 13-22.

insureds that it thought would die within four to seven years of purchase. Company officials necessarily exercised discretion and judgment in choosing policies because, as Calhoun explained, "[T]here's always a policy out there that we can purchase." In making offers to investors, PWCG presented them with policies that had already been selected by PWCG along with summaries of the insureds' medical records—but not the original medical records themselves. Calhoun said, "There's no way that we would be able to redact [a complete set of original medical records] and give all that information to every potential investor." Investors understood PWCG to be recommending policies to them and found the curation valuable, including the assessment that the insured would likely die soon enough to make the purchase profitable.

PWCG emphasized its "efforts and expertise," *Eurobond*, 13 F.3d at 1341, in its promotional materials. In its brochure, PWCG touted its special ability to choose the precise policies that would pay out high returns for investors. PWCG advertised the above-average returns that it would be able to secure because of its "approach that has been tested and proven reliable . . . [with] high standards for investments." The PWCG brochure also said, "We are proud of the methodology we have devised for supporting preservation of principal and capital and maximizing return potential for our investors." PWCG assured investors that "[e]ach policy submitted to us undergoes rigorous scrutiny using a predetermined set of criteria, and we select the most desirable from approximately $250+ million worth of policies per month." One investor explained that they understood "the whole foundation" of PWCG's business is "to make sure that [investors] get some, you know, good policies." PWCG emphasized its special expertise and skill

in choosing policies that would produce profit for potential investors.

We placed similar emphasis on expertise in *SEC v. Eurobond Exchange, Ltd.*, where "it [wa]s beyond dispute that any profits to investors came from the efforts and expertise of Eurobond" in selecting when to purchase bonds, which bonds to purchase, how many bonds to purchase, which banks to borrow from, what currency to transact in, and more. *Id.* Likewise, in *SEC v. Rubera*, 350 F.3d 1084 (9th Cir. 2003), we held that a pay telephone investment program was a security because "investors in Mr. Rubera's telephone investment program were passive, completely relying" on the "expertise and care" of Rubera's company to do things like "select a suitable location for the telephone, install the pay telephone, maintain the telephone," and other tasks. *Id.* at 1092.

Defendants suggest that their life settlements were not investment contracts because investors made the ultimate decision to invest in any specific policy. But all buyers have the ultimate prerogative to decide whether to put their money into a transaction or not. The relevant inquiry under the *Howey* test is whether PWCG's investors were led to expect profits from the efforts of others. Investors here were so led, in part, because PWCG presented investors with a curated subset of policies that PWCG said it had chosen specifically based on its evaluation of those policies' financial terms and the underlying insureds' health.

Defendants argue that this case is like *Noa* or *Belmont Reid*. Instead of the external market force being the global demand for precious metals, Defendants argue here that the relevant external force is the insureds' date of death. *See Noa*, 638 F.2d at 79; *Belmont Reid*, 794 F.2d at 1391. No

one, they point out, can predict *exactly* when an insured will die. Because the unpredictability of death means that life settlement policies are unpredictable too, Defendants contend that profits were not dependent on PWCG but on the variability of insureds' deaths.

Defendants confuse "profit" with "payout." Absent wrongdoing, nobody can predict exactly when someone else will die. Thus, no one can predict exactly when to expect a *payout* from a life insurance policy. But an investor's *profit*, key to the *Howey* test, depends not just on an insured's death but also on the price that PWCG secured for that policy and on the number and size of additional premium payments needed to maintain the policies. The "undeniably significant" efforts that mattered for the success or failure of PWCG's profitability in its life settlements include the research and evaluation that PWCG conducted in selecting policies and the price that PWCG paid. *See Glenn W. Turner Enterprises*, 474 F.2d at 482.

The speculative aspects of life settlements are analogous to the fractional land interests in *SEC v. Schooler*, 905 F.3d 1107 (9th Cir. 2018). In *Schooler*, we held that the sales of fractionalized interests in land sold via general partnership shares were investment contracts. *Id.* at 1112. Even though "[a]n investment in land for long-term holding is *inherently speculative*, . . . decisions about what property to purchase and how much to pay for it are among the most important decisions in determining the success of the investment." *Id.* at 1113 (emphasis added). Life settlements are likewise, in one respect, "inherently speculative." *Id.* Yet which policies to buy and how much to pay for them are similarly "among the most important decisions in determining the success of the investment." *Id.*; *see also Living Benefits Asset Mgmt.*, 916 F.3d at 540 ("[T]he most important factors bearing on

life settlements' profitability are the accuracy of the actuarial estimates and the life settlements' purchase prices.").

In concluding that PWCG's selection of policies helps establish investors' dependence on the efforts of others, we take into account PWCG's "pre-purchase activities," that is, activities PWCG engaged in before transacting with investors. Pre-purchase activities here included the evaluation and selection of policies to offer to investors. We conclude that pre-purchase activities are relevant in assessing whether an investor is dependent on the efforts of others because that approach is consistent with the flexible and remedial purpose of the federal securities laws and with our precedents. We do not limit our consideration to PWCG's "post-purchase activities," that is, actions taken after the sale of the fractional interests to investors, such as paying policy premiums and distributing the benefits when insureds die.

Three other courts of appeal have considered how to weigh pre-purchase activities in this context, with the D.C. Circuit concluding that these activities should be heavily discounted, if weighed at all, and the Eleventh and Fifth Circuits concluding that they should be weighed case by case.

The D.C. Circuit in *SEC v. Life Partners, Inc.*, 87 F.3d 536 (D.C. Cir. 1996), held that the viatical settlements at issue there were not investment contracts because they did not meet the efforts-of-others requirement from *Howey*. *Id.* at 538. The majority opinion discounted the pre-purchase entrepreneurial efforts of the promoters, reasoning,

> [I]f the value of the promoter's efforts has already been impounded into the promoter's

fees or into the purchase price of the investment, and if neither the promoter nor anyone else is expected to make further efforts that will affect the outcome of the investment, then the need for federal securities regulation is greatly diminished.

*Id.* at 547. The majority noted that the only significant post-purchase activities Life Partners engaged in were "ministerial functions," as opposed to "entrepreneurial activities" that could affect profits. *Id.* at 546, 548. The main "entrepreneurial activities" occurred *before* purchase and thus were "impounded" into the purchase price. *Id.* at 547-48. The D.C. Circuit concluded that the SEC was "unable to show that the promoter's efforts have a predominant influence upon investors' profits." *Id.* at 548. Therefore, the viatical settlements were not securities. *Id.*

The Eleventh and Fifth Circuits expressly declined to adopt the D.C. Circuit's approach and instead considered promoters' pre-purchase efforts in holding that life settlements are securities. *See SEC v. Mut. Benefits Corp.*, 408 F.3d 737, 745 (11th Cir. 2005); *Living Benefits Asset Mgmt. v. Kestrel Aircraft Co.*, 916 F.3d at 540-41. The Fifth Circuit noted that the *Life Partners* approach "has been widely criticized by both courts and commentators" and said that *Life Partners* "takes an overly rigid approach considering the remedial aim of federal securities law." *Living Benefits Asset Mgmt.*, 916 F.3d at 541.

We agree with the Eleventh and Fifth Circuits that pre-purchase activities can be relevant for evaluating whether profits can be expected to come from the efforts of others. Three factors guide our consideration.

First, a strict distinction between pre- and post-purchase efforts begs the question of whether pre-purchase efforts actually become "impounded" into an investment's purchase price. The D.C. Circuit majority reasoned that it could heavily discount pre-purchase entrepreneurial activities in evaluating the efforts of others because the value of those activities will have "already been impounded into the promoter's fees or into the purchase price of the investment." *Life Partners*, 87 F.3d at 547. Thus, the "need" for the federal securities laws to mandate disclosure "is greatly diminished." *Id.*

The problem with the logic of "impoundment" is that it assumes, unrealistically, that information about pre-purchase efforts will be appreciated by investors and thus become "impounded" into the final price. Yet the "impoundment" of relevant information is why the federal securities laws "compel[] full and fair disclosure." *See Howey*, 328 U.S. at 299. Full and fair disclosure enables a transaction and its terms to reflect available information and to allow investors to make informed decisions. In other words, the impoundment of relevant information into investors' knowledge depends on the very issue at stake in a failure-to-register case such as this one: whether the securities laws mandate the information disclosure attendant to registration in the first place.

Second, a bright line between pre- and post-purchase activities would be inappropriately formalistic given the purpose and function of the federal securities laws. The securities laws contain a "broad definition of 'security,' sufficient 'to encompass virtually any instrument that might be sold as an investment.'" *SEC v. Edwards*, 540 U.S. 389, 393 (2004) (quoting *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990)). The Supreme Court has said, "We will not read

into the securities laws a limitation not compelled by the language that would so undermine the laws' purposes." *Id.* at 395. We think that Judge Wald was correct to note in her dissent from the D.C. Circuit's opinion in *Life Partners* that the majority's "bright-line rule," and its emphasis on post-purchase entrepreneurial efforts, "elevates a formal element, timing, over the economic reality of the investors' dependence on the promoter." 87 F.3d at 551 (Wald, J., dissenting). Judge Wald criticized the pre-/post-purchase distinction for "undercut[ting] the flexibility and ability to adapt to 'the countless and variable schemes' that are the hallmarks of the *Howey* test." *Id.* (quoting *Howey*, 328 U.S. at 299). The Eleventh Circuit agreed that "there is no basis for excluding pre-purchase managerial activities from the analysis." *Mut. Benefits Corp.*, 408 F.3d at 743 (citing *Life Partners*, 87 F.3d at 551 (Wald, J., dissenting)). "Indeed," that court explained, "investment schemes may often involve a combination of both pre- and post-purchase managerial activities, both of which should be taken into consideration in determining whether *Howey*'s test is satisfied." *Id.* at 743-44.

Third, a disregard of pre-purchase efforts could open loopholes in the securities laws' otherwise broad coverage. If courts discounted pre-purchase entrepreneurial efforts in assessing whether a transaction was an investment contract, then promoters could front-load their activities before any investor provides consideration for a legal interest. The risk here would include transactions where investors are dependent on the expertise of the promoter. Judge Wald warned that the *Life Partners* majority's decision risks "exempting the sale of other risky asset-based interests from the scope of the securities laws," such as curated packages of bonds and financial derivatives, where profits depend on

"the promoter's skill in selecting what bonds to purchase" or on "the dealer's expertise in balancing positions in different markets," respectively. *SEC v. Life Partners*, 102 F.3d 587, 590 (D.C. Cir. 1996) (Wald, J., dissenting from denial of rehearing and rehearing en banc).

Our decision in *Noa v. Key Futures* does not compel us to draw a bright line between pre-purchase activities that matter less in an analysis of *Howey*'s efforts-of-others prong and post-purchase activities that matter more. The *Life Partners* majority cited our decision in *Noa v. Key Futures*, 638 F.2d at 79, in support of discounting pre-purchase entrepreneurial activities because there the promoter's "pre-purchase efforts," such as identifying investments and finding investors, "were only minimally related to the profitability of the investment," which depended primarily on the global price of silver. *Life Partners*, 87 F.3d at 546. We think that a better reading of *Noa* confirms that the *Howey* analysis is more holistic. Key Futures' sale of silver bars were not investment contracts because "the profits to the investor depended upon the fluctuations of the silver market, not the managerial efforts of Key Futures." *Noa*, 638 F.2d at 79. *Noa* thus confirms that the relevant inquiry into whether an investment contract exists depends on whether an investor is led to expect profits from the promoter or a third party. *Noa* does not, however, dictate exactly *when* such representations must have been made. As the Eleventh Circuit noted, "While it may be true that the 'solely on the efforts of the promoter or a third party' prong of the *Howey* test is more easily satisfied by post-purchase activities, there is no basis for excluding pre-purchase activities from the analysis." *Mut. Benefits Corp.*, 408 F.3d at 743.

### 2. Premium Reserve System

PWCG's system of paying the premiums on insurance policies is another feature that supports our conclusion that its actions were "undeniably significant" and "essential managerial efforts which affect[ed] the failure or success of the enterprise." *Glenn W. Turner Enters.*, 474 F.2d at 482. Calhoun, the head of PWCG, said that "PWCG protects clients' investments with a three-tiered premium reserve system that is unique in the industry." As noted above, at 5-6, the first tier, the "primary premium reserve," contained enough money to pay premiums for six to nine years. If PWCG spent all the money in the first tier, meaning that the insured lived longer than the six to nine years expected by PWCG, then PWCG could turn to the second tier, financed by "1% of all investor money for all policies." If the second tier ran out of funds, then the tertiary reserve would pay for premiums. The tertiary reserve was made up of "excess or unused premium dollars from any primary reserve" whose insured died before their policy's primary reserve ran out. Finally, if PWCG exhausted all three tiers of the premium reserve system, then PWCG could make "premium calls" where they invoiced investors for additional money.

The premium reserve system reflects that PWCG's investors were dependent on the efforts of PWCG to profit. The premium reserve system was an essential part of PWCG's issuance of life settlements. PWCG emphasized the system as "proprietary" in its promotional materials. Investors relied on PWCG to structure premium payments. Individual investors could not calculate on their own the premiums necessary to maintain policies. PWCG said that it "goes the extra mile to assure policies are protected." Though investors were warned that premium calls were a possibility, PWCG also promised, "We have established this

plan to pay premiums so that every policy is kept in force." Together with the selection of the most profitable policies, the premium reserve system played a significant role in whether investors would profit from life settlements.

Promoters' efforts in providing essential ongoing services for an investment are a relevant factor in *Howey*'s efforts-of-others analysis. In *Rubera*, the promoters were an individual, Rubera, and his solely owned corporation, Alpha Telcom, Inc. *See Rubera*, 350 F.3d at 1086-87. In addition to depending on Alpha for the selection of sites for pay telephones in which purchasers invested, investors were also "completely rel[iant]" on Rubera and Alpha to "install the pay telephone, maintain the telephone, pay all monthly telephone and utility bills, as well as obtain all regulatory certifications." *Id.* at 1092. We explained, "These functions were all crucial to the profitability of the investments in the pay telephones, and, concomitantly, to the success of the investment program as a whole." *Id.* "The entire scheme hinged on Alpha's efforts, managerial skill, and—as became evident at the time of Alpha's demise—continued solvency." *Id*.

PWCG's premium reserve system was more sophisticated than the maintenance of pay telephones by Rubera and Alpha. That fact supports an inference that PWCG investors were dependent on PWCG to profit. Rubera and Alpha were responsible for the operation, accounting, and regulatory compliance of their pay telephones. *Id.* PWCG did similar tasks and more. PWCG had to estimate lifespans and payouts in order to structure and fund the premium reserve system. PWCG chose the amount of money to direct toward paying premiums for six to nine years from the date of purchase, based on the projected cost of insurance, the cash surrender value of the

policy, and "interest rates, mortality rates, and expense charges." If the primary reserve system ran out, then PWCG would draw on the secondary and tertiary reserves, which PWCG also structured based on its calculations of contingent events.

Defendants argue that the premium reserve system was simply an administrative, "ministerial" function and did not require managerial or entrepreneurial skill. Defendants further suggest that PWCG's ultimately inadequate financing of the premium reserve system was indicative of a lack of managerial efforts because insureds' longevity, not PWCG's premium reserve system, was the final determinant of profit.

The ultimate breakdown of the premium reserve system demonstrates the opposite. PWCG's efforts were "undeniably significant," *see Glenn W. Turner Enters.*, 474 F.2d at 482, to investors' realizing profit, because profitability turned on how skillfully PWCG structured that system. If PWCG estimated insureds' lifespans poorly, as it did, then that would undermine investors' profits by increasing the cost investors would have to pay to maintain the policies.

During PWCG's operation, the primary reserve system proved unable to make all premium payments, which resulted in PWCG having to decide between tapping into the reserves, paying the post-purchase premiums with its own profits, not paying the premiums, or asking investors for more money in a "premium call." PWCG eventually drew on its secondary and tertiary reserves and, when those reserves ran out, made premium calls. To predict how large premium calls needed to be, PWCG and the trustee of PWCG Trust, Mills Potoczak, contracted with a third-party

who specialized in estimating optimal premium payments. Premium calls often ended up being higher than investors understood they would be from previous representations. At least 150 investors received premium calls for a total of approximately $1.7 million. Those who did not answer were told that they had lost their investments.

The receiver of PWCG Trust, Thomas C. Hebrank, explained that operating a successful premium reserve system required managerial, and not simply ministerial or clerical, skill. In 2018, the district court appointed Hebrank to be receiver over the PWCG Trust as part of the SEC's consent judgment with PWCG Trust. Hebrank attributed PWCG's struggles to its mismanagement and poor judgment as to insureds' lifespans. He explained that PWCG and Calhoun underestimated how long insureds would live because "Calhoun did not use policyholder life expectancies . . . in calculating reserves and instead focused on achieving an immediate return to Pacific West." As a result, by the time Hebrank took control of PWCG Trust, "most . . . reserves ha[d] been exhausted." Hebrank explained that from 2012 to 2017, PWCG used the sale of new policies to pay the outstanding premiums on older policies so that it could avoid drawing on the secondary and tertiary reserves and making premium calls. PWCG's failure to set aside sufficient money in the premium reserve system and failure to use actuarial life expectancy estimates "predestined the shortfalls in reserves amounts for each of the Policies," Hebrank explained. "This problem was then exacerbated by [PWCG's] fail[ure] to engage in the high level of management required to maintain the Policies."

The breakdown of the premium reserve system during PWCG's operation indicates that a lack of managerial skill produced the near failure of PWCG's life settlement

investments. By structuring the system initially, maintaining the system as premiums mounted, choosing whether to make premium calls or pay out of its founder's own pocket, and managing premiums after premium calls were filled, PWCG exercised "essential managerial" and entrepreneurial judgment that "affect[ed] the failure or success of the enterprise." *Glenn W. Turner Enters.*, 474 F.2d at 482.

### 3. Fractionalized Interests

Finally, the fractionalized nature of investors' interests also supports the conclusion that PWCG's life settlements were investment contracts because investors were dependent on PWCG and their "exercise of control was precluded for all practical purposes." *See Dubois*, 885 F.2d at 1461. While a nonfractionalized investment might involve the purchase of entire life insurance policies in which the investor exerts some measure of control, the fractionalized nature of the life settlements here created an interdependence among numerous investors. This interdependence meant that investors were dependent on PWCG to have properly structured the premium reserve system and on PWCG Trust and Mills Potoczak to implement that system. Investors were particularly dependent on PWCG bringing together sufficient numbers of creditworthy investors to maintain policies. Each policy had multiple investors with fractional interests, sometimes as many as fifty to seventy. Investors could not calculate premium payments themselves. They relied on PWCG and Mills Potoczak to decide when to make premium payments and issue premium calls. If the reserve system broke down and some investors did not pay premium calls, PWCG would have to decide whether its own money would cover any potential shortfalls.

The fractional nature of investors' interests also meant that investors seeking to invest in specific policies had to go through PWCG, a situation akin to our decision in *Goldfield*. There, we held that Goldfield's ore refining program was "the undeniably significant effort" for the *Howey* test. *Goldfield*, 758 F.2d at 464. Among other factors, we noted that Goldfield had "what was represented to be the only economically feasible dump ore processing technique." *Id.* While the investors in *Goldfield* were allowed to take ore purchased from Goldfield to other processors, they had to pay a $20,000 bond and were told that no other processor would process that ore in such small quantities. *Id.* We explained that "as a practical matter, the investors were forced to rely exclusively upon the services of Goldfield." *Id.* Here, the fractionalized nature of PWCG's policies' beneficiary interests meant that an investor trying to invest in any one of PWCG's policies was similarly "forced to rely exclusively upon" PWCG, both in purchasing their fractionalized interest as well as in maintaining it. *Id.*

The workings of PWCG's whole system—its selection of policies, its premium reserve system, and its fractionalization of those policies—demonstrate PWCG's "undeniably significant" efforts in securing their investors' profits. *Glenn W. Turner Enters.*, 474 F.2d at 482. Investors depended on the entire package of services that PWCG offered to manage and maintain the life insurance policies. We therefore conclude that the fractional interests in life settlements sold by PWCG were investment contracts subject to the federal securities laws.

## B.  Intrastate Offering Exemption

The Securities Act of 1933 prohibits the interstate sale of securities without a registration statement, which discloses

relevant information "in the public interest or for the protection of investors." *See* 15 U.S.C. §§ 77e(a), 77e(c), 77g(a)(1), 77aa. Some types of securities are exempt from the Securities Act's registration requirement. Relevant here, the intrastate offering exemption excludes from the Securities Act's registration requirement "[a]ny security which is part of an issue offered and sold only to persons resident within a single State or Territory, where the issuer of such security is a person resident and doing business within or, if a corporation, incorporated by and doing business within, such State or Territory." *Id.* § 77c(a)(11). In other words, if securities are sold entirely within a single state and not part of an interstate offering, then they are exempt from federal registration requirements. We have explained that "[b]ecause registration is so important to the protection of the investing public, exemptions to registration requirements are construed narrowly against the parties claiming their benefits." *World Trade Fin. Corp. v. SEC*, 739 F.3d 1243, 1247 (9th Cir. 2014).

We agree with the district court that PWCG's issue of fractional interests in life settlements was not exempt from the federal securities laws' registration requirements. PWCG's life settlements shared a financing scheme, were the same type of security, and were offered to at least one out-of-state resident. Therefore, PWCG's offerings were part of an integrated, interstate offering.

### 1. Interstate Offering

Defendants have not shown that they qualify for the intrastate exemption from registration. PWCG did not sell life settlements solely within California. The district court noted that PWCG had offered and sold life settlement interests to Samuel John Bainbridge, a Nevada resident.

Bainbridge said that he learned about PWCG from a seminar PWCG presented in Las Vegas, Nevada. Bainbridge invested with PWCG through his family trust, which was a Nevada state trust. Bainbridge said that PWCG founder Andy Calhoun

> knew without any doubt, 100 percent, that I resided in Las Vegas, Nevada, 100 percent. There's no questions about that. Okay? And there was talk, you know, about, ["]These are California investments but, you know, if you can get something, you know, to state that you're in California, then this will be just all fine and dandy. It's just paperwork.["]

PWCG, a California corporation, offered life settlements to Bainbridge, a Nevada resident. PWCG's offerings do not qualify for the intrastate exemption because PWCG did not offer its securities exclusively within one state.

### 2. Integration

We conclude that the district court correctly rejected Defendants' argument that the fractional interests in life settlements were not an integrated issue. Integration matters here because many, if not most, of PWCG's sales were to fellow California residents. If those sales were not integrated and instead considered separately from PWCG's sales to out-of-state residents, then all of PWCG's offerings to other California residents could be exempt from federal registration requirements and thus not be bases for Defendants' liability. Conversely, if PWCG's offers and sales were integrated, then PWCG's offer and sale to a non-California resident indicates that the issuance did not qualify for the intrastate exemption.

The district court properly applied the SEC's five-factor inquiry, which we adopted in *SEC v. Murphy*, 626 F.2d 633 (9th Cir. 1980), to conclude that the offering was integrated. The five factors ask

> (1) are the offerings part of a single plan of financing;
> (2) do the offerings involve issuance of the same class of security;
> (3) are the offerings made at or about the same time;
> (4) is the same type of consideration to be received; and
> (5) are the offerings made for the same general purpose.

*Id.* at 645.

At least four of the five factors favor a conclusion that the offerings were integrated. On the first factor, PWCG's life settlements were "part of a single plan of financing" because, as the district court noted, they were all part of the premium reserve system. On the second factor, all offerings were of the "same class" because they were fractionalized interests in life insurance policies held by PWCG Trust. *Cf. id.* at 646 (characterizing limited partnerships as the same class of security). On the fourth factor, Defendants do not contest that PWCG received the same "type of consideration" for the interests. *Cf. id.* Finally, on the fifth factor, PWCG's life settlement offers were all "made for the same general purpose" of profiting from the deaths of insureds. The third factor, timing, is a closer question, as the offerings were made over an eleven-year period and occasionally showed a lapse of a few months between sales.

But the other four factors weigh in favor of the district court's conclusion that PWCG's life settlement offerings were integrated. *See id.* (concluding that an offering was integrated because four out of five factors sufficiently "militate[d] in favor of finding integration").

Defendants do not contest directly the district court's application of the five integration factors. Instead, they argue that the SEC failed to make its prima facie case that PWCG's offering was integrated and that the district court abused its discretion in excluding their expert witness report on the legal test for integration. On both arguments, Defendants are incorrect.

First, on summary judgment, the SEC did not bear the burden of establishing integration. Federal Rule of Civil Procedure 56(a) mandates summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Non-integration is an element of Defendants' affirmative defense because Defendants claim that they are exempt from federal registration requirements. The burden of proof to establish an exemption is on the party claiming it. *See SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953); *World Trade Fin. Corp.*, 739 F.3d at 1247-48. Accordingly, Defendants, not the SEC, bore the burden of establishing a genuine dispute of material fact on the question of integration. To make its prima facie case at summary judgment, the SEC only had to point to an absence of a genuine dispute of material fact on non-integration, not affirmatively establish that PWCG's offering was integrated. The Supreme Court has specifically held that Rule 56 does not require the movant to "support its motion with affidavits or other similar materials *negating* the opponent's claim." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The

district court properly put the burden on Defendants to show a genuine dispute of material fact at summary judgment on the issue of integration.

Second, the district court properly excluded Defendants' expert witness' report on integration. We review a district court's exclusion of expert testimony at summary judgment for abuse of discretion. *See Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1227 (9th Cir. 1998). Rule 702(a) of the Federal Rules of Evidence requires that an expert witness "may testify in the form of an opinion" if, among other factors, "it is more likely than not that . . . the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." The ultimate question of whether a securities offering is integrated is a question of law, as Defendants' expert witness himself acknowledged. Here, Defendants' expert witness was offering a legal interpretation that would not aid the district court in finding facts. Therefore, the district court did not abuse its discretion in excluding the report. *See Aguilar v. Int'l Longshoremen's Union Loc. No. 10*, 966 F.2d 443, 447 (9th Cir. 1992) (explaining that "matters of law for the court's determination" are "inappropriate subjects for expert testimony").

## C. Disgorgement

We affirm the district court's disgorgement award.

A district court's award of disgorgement for securities violations is reviewed for abuse of discretion. *SEC v. Hui Feng*, 935 F.3d 721, 737 (9th Cir. 2019).

The SEC has the power to seek, and federal courts to award, "any equitable relief that may be appropriate or necessary for the benefit of investors," including

"disgorgement" specifically. 15 U.S.C. §§ 78u(d)(5), 78u(d)(7); *see also Liu v. SEC*, 591 U.S. 71, 75-79 (2020) (upholding 15 U.S.C. § 78u(d)(5)).

The SEC here requested disgorgement of all of the Defendants' profits. The district court awarded disgorgement of one-third of Defendants' commissions "to be distributed to investors." The district court's disgorgement order required Barry to pay $227,000, Cannon to pay $219,333.33, and Moody to pay $180,000, which are one-third of the ill-gotten gains received by each of them as identified by the district court. The district court reasoned that investors were harmed in two ways, in addition to any loss of their principal investment. First, they suffered defeat of their expectations of profit based upon PWCG's representations. Second, the investors lost the time value of their money because of the "substantial delay in recouping the principal amount of their investments." The district court declined, however, to order disgorgement of the full amount of the Defendants' profits because, the district court concluded, they were less blameworthy than Calhoun, whose settlement with the SEC required that he disgorge half of his profits.

On appeal, Defendants argue that the district court erred in awarding disgorgement because disgorgement requires pecuniary harm to victims and no pecuniary harm exists since investors are projected to recover the money they invested.

We affirm the district court's finding of pecuniary harm. Buyers of PWCG's fractional interests in life settlements suffered pecuniary harm through the loss of the time value of their money. The time value of money refers to the concept that money is worth more today than the same

nominal amount in the future because that money could be put to use by its owner in the meantime. *See* Cong. Budget Off., *How CBO Uses Discount Rates to Estimate the Present Value of Future Costs or Savings* 2 (2024). The time value of money relies on the concept of "opportunity cost" or the cost of one activity measured in relation to the next best, foregone activity. *See* Off. of Mgmt. & Budget, Exec. Off. of the President, Circular No. A-4, at 29 (2023) ("The opportunity cost of an alternative includes the value of the benefits forgone as a result of choosing that alternative."). Courts routinely recognize the time value of money by awarding interest on judgments, both post-judgment, to reflect the value between the dates of judgment and payment, and sometimes pre-judgment, incorporating within a damage award the value lost between the date of injury and the date judgment is entered.

We have also recognized the time value of money as a pecuniary harm in the context of the Excessive Fines Clause and Article III standing. *See Pimentel v. City of Los Angeles*, 115 F.4th 1062, 1069 (9th Cir. 2024) (including the "time-value of [parking] fees not collected timely" as a type of "monetary harm" to the city for purposes of an Excessive Fines Clause analysis); *Van v. LLR, Inc.*, 962 F.3d 1160, 1161 (9th Cir. 2020) (holding that the "temporary deprivation of money gives rise to an injury in fact for purposes of Article III standing" because "its rightful owner loses the time value of the money") (internal quotation marks omitted). Our decision in *Van* illustrates that, like the pecuniary harm to investors here, the relevant harm is the loss of "the *use* of [one's] money." *Van*, 962 F.3d at 1165 (emphasis added). The consumer in *Van* "received a full refund, less interest, on the money she was wrongfully charged." *Id.* at 1162. Similarly, PWCG investors will likely

receive a full refund of, but not interest on, the money they put into PWCG's life settlements. Like the consumer in *Van*, the investors here lost out on the ability to use their money for alternate purposes. *See id.* at 1165 ("Interest is simply a way of measuring and remedying . . . injury, not the injury itself.").

Investors put their money into PWCG's life settlements. Net losses across all outstanding policies were "approximately $69 million" as of the end of 2023, according to the receiver overseeing those policies. The receiver reported that "there are now about a dozen Policies that have gone significantly past their prior projected maturity dates, meaning it has taken (and will take) longer to receive the death benefits from those Policies and has required (and for some time, will require) more premium payments to keep the Policies in good standing than previously anticipated." Like everyone, the insureds will eventually die, meaning that life settlements will one day pay out to investors. The receiver has projected that the outstanding life settlements will eventually return to investors at least the money that they put in.[4] But even if investors recover their principal investment in PWCG's life settlements, they still lost out on the opportunity to put that money to other uses, and that loss is a cognizable pecuniary harm.

Defendants focus on the district court's conclusion that investors suffered pecuniary harm because they lost out on

---

[4] Investors appear likely to recoup the principal amount of their payments to PWCG not only because of the SEC's enforcement action here, which led to the appointment of a receiver, but also because the COVID-19 pandemic meant that some insureds died earlier than they likely would have otherwise.

their expectations of profits.[5] Defendants do not address the district court's alternate and sufficient grounds for finding pecuniary harm, which is the investors' loss of the time value of their money. Ignoring the time value of money is particularly ill-suited here because the whole concept of life settlements rests upon the idea that money today is more valuable than money tomorrow. The original insureds were willing to sell their policies for less than they were potentially worth because they preferred to have money sooner. Letting Defendants disregard the time value of money here would be especially perverse.

We do not need to address the question of whether disgorgement is permissible in the absence of pecuniary harm.[6] Since there was pecuniary harm to investors here in

---

[5] We do not base our decision on the district court's identification of defeated expectations as a basis for pecuniary harm. *See Maner v. Dignity Health*, 9 F.4th 1114, 1119 (9th Cir. 2021) ("We . . . may affirm on any ground supported by the record."). In other contexts, it has been suggested that defeated expectations could be a type of pecuniary harm. *See, e.g.*, U.S. Sent'g Guidelines Manual § 2B1.1(b)(1)(C)(iii) (U.S. Sent'g Comm'n 2024) ("'Pecuniary harm' means harm that is monetary or that otherwise is readily measurable in money."); *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 723 (9th Cir. 2022) ("The cancellation of the field trips and prohibition of future field trips caused Riley's Farm to lose a valuable government benefit in the form of an *expected pecuniary gain . . . .*" (emphasis added)). We do not need to resolve whether defeated expectations should qualify as pecuniary loss in this context, as the loss of the time value of money is sufficient to establish that the investors suffered a pecuniary loss here.

[6] Two circuit courts have split on whether pecuniary harm is required for a disgorgement award under the federal securities law. The Second Circuit held that pecuniary harm is required for disgorgement because *Liu*'s requirement that disgorgement under Section 78u(d)(5) be "awarded for victims" and "restore[] the status quo" would render disgorgement unnecessary if investors did not suffer pecuniary here.

the form of investors' lost time value of money, we affirm the district court's award of disgorgement.

### D.  Injunction and Civil Penalties

Defendants argue that the district court erred in enjoining Defendant Cannon from future violations of the securities laws and in ordering civil penalties from all three Defendants. We review a district court's remedies for abuse of discretion. *Husain*, 70 F.4th at 1180. We affirm the district court's imposition of its injunction against Cannon and its civil penalties against Barry, Cannon, and Moody.

Before discussing these two remedies, we reject Defendants' argument that the remedies ordered by the district court contravened our recent decision in *SEC v. Husain*, 70 F.4th 1173. In that case, we held that genuine disputes of material fact existed regarding defendant's scienter and recognition of wrongfulness, and that those outstanding issues precluded the imposition of civil penalties at the summary judgment stage. *See id*. at 1184-86. In our case, the district court did not abuse its discretion in concluding that there were no genuine disputes of material fact regarding the liability of Defendants. It was therefore entitled to weigh facts in determining the appropriate remedy to impose on those Defendants. That the facts could have

---

*SEC v. Govil*, 86 F.4th 89, 102-03 (2d Cir. 2023) (quoting *Liu*, 591 U.S. at 79-80). The First Circuit rejected *Govil*, relying instead on *Liu*'s explanation that disgorgement deprives wrongdoers of their ill-gotten gains: "Neither *Liu* nor our case law, however, require investors to suffer pecuniary harm as a precondition to a disgorgement award." *SEC v. Navellier & Assocs., Inc.*, 108 F.4th 19, 41 n.14 (1st Cir. 2024), *cert. denied*, __S. Ct.__, 2025 WL 1603606 (June 6, 2025) (No. 24-949). We do not speak to that question, nor do we address the import, if any, of Congress' addition of disgorgement as an available remedy following *Liu* under 15 U.S.C. § 78u(d)(7).

been weighed differently did not preclude the district court's remedies. *See SEC v. Murphy* (*Murphy II*), 50 F.4th 832, 848 (9th Cir. 2022) (noting that district courts can make factual findings for the purpose of determining appropriate remedies).

### 1. Injunction Against Cannon

We affirm the district court's injunction against Cannon. In determining whether to issue an injunction, courts consider whether there is a "reasonable likelihood of future violations of the securities laws." *Murphy,* 626 F.2d at 655. To guide that inquiry, we have used five factors as in *Murphy*: (1) "the degree of scienter involved"; (2) "the isolated or recurrent nature of the infraction"; (3) "the defendant's recognition of the wrongful nature of his conduct"; (4) "the likelihood, because of the defendant's professional occupation, that future violations might occur"; and (5) "the sincerity of his assurances against future violations." *Id*.

The district court concluded that the *Murphy* factors favored an injunction against Cannon, but not Barry or Moody, for future securities law violations. Though all Defendants' lack of scienter weighed *against* an injunction and their sincerity of assurances against future violations "weigh[ed] neither for nor against" an injunction, the district court permissibly concluded that the "recurrent nature" of the wrongdoing, Cannon's limited recognition of his wrongdoing as evidenced by misrepresentations, Cannon's discounting of those misrepresentations, and his intent to remain in the financial services industry, unlike Barry or Moody, together favored an injunction against only Cannon.

Defendants argue that the district court erred in applying the second and third *Murphy* factors. On the second factor,

Defendants argue that the district court should have considered a lack of other securities violations as favoring a conclusion that the violations here were "isolated" and not "recurrent." The district court could have placed more weight on the absence of other securities violations, but an absence of other securities violations does not necessarily preclude a finding of "recurrent" violations. *See Murphy II*, 50 F.4th at 840, 842 (holding that Jocelyn Murphy providing false zip codes on at least 21 different occasions for the purpose of one proceeding against her sufficed to make her violations "recurrent"). Although Defendants' sales of PWCG life settlements were part of a single scheme, they were numerous and took place over several years. Therefore, the district court did not err in concluding that Defendants' violations were "recurrent."

Defendants also argue that the district court erred in applying the third *Murphy* factor, which weighs "the defendant's recognition of the wrongful nature of his conduct." In support of their position, they point to Cannon's two attempts to research the legal status of PWCG's life settlements. But Defendants conflate scienter—the first *Murphy* factor—with recognition of wrongfulness—the third. The third factor, recognition, relates to whether the defendant "take[s] responsibility for the impact of his illegal conduct on the market's integrity." *See Husain*, 70 F.4th at 1185 (internal quotation marks omitted). Here, the district court pointed to instances where Cannon "discounted the importance of [past] misrepresentations" (such as the "likelihood of premium calls and PWCG's track record") to investors, which it found was indicative of Cannon's failure to appreciate the wrongfulness of his actions. Defendants do not offer relevant record evidence to cast material doubt on

the district court's determination. The district court did not err on the third *Murphy* factor.

### 2. Civil Penalties Against Barry, Moody, and Cannon

We also uphold the civil penalties of $15,000 each against Barry, Moody, and Cannon. The district court did not abuse its discretion in imposing those penalties.

A district court can apply three "tiers" of civil penalties. The first tier does not require a finding of scienter and authorizes a maximum penalty of $7,500 per violation or the "gross amount of pecuniary gain to such defendant as a result of the violation." 15 U.S.C. §§ 77t(d)(2)(A), 78u(d)(3)(B)(i); 17 C.F.R. § 201.1001 (adjusting the maximum first-tier penalty to $7,500). "District courts have discretion to determine what constitutes a 'violation' and have relied on various proxies," such as the "number of investors defrauded," "number of fraudulent transactions," "number of statutes . . . violated," "number of months [defendants] engaged in unregistered broker activity," or "number of transactions . . . made as an unregistered broker." *Murphy II*, 50 F.4th at 848. Courts look to the five *Murphy* factors to guide the determination of a civil penalty award "in light of the facts and circumstances of the case." *Husain*, 70 F.4th at 1184 (internal quotations marks omitted).

Defendants raise three arguments on appeal. Two closely resemble their arguments against Cannon's injunction: first, that Defendants did not act with scienter, and second, that the recognition-of-wrongfulness factor favored them. As with the injunction, we reject Defendants' arguments. The district court recognized that Defendants had not been found to have acted with scienter and took these findings into

account by imposing a substantially lesser penalty than it could have.

Defendants' third argument is unique to the civil penalty award. Defendants argue that the district court erred in calculating penalties of $15,000 against each Defendant, which they allege is twice the maximum statutory penalty.

The district court did not err because the civil penalty amount of $15,000 each is not greater than the maximum statutory amount. As discussed, the district court had broad discretion to rely on various proxies to determine the number of violations, such as the number of months each Defendant engaged in unregistered broker activity or the number of transactions they conducted while unregistered. *See Murphy II*, 50 F.4th at 848. The district court also expressly declined to impose the statutorily permitted "total amount of pecuniary gain" because that amount was "already accounted for in the disgorgement" discussion. The district court's disgorgement order required Barry to pay $227,000, Cannon to pay $219,333.33, and Moody to pay $180,000, each representing only one-third of each Defendants' gross amount of pecuniary gain. As $15,000 is far less than these amounts, the district court did not err.

## III.  Conclusion

We affirm the district court's judgment.

**AFFIRMED.**